# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

LEAGUE OF WOMEN VOTERS OF MICHIGAN v SECRETARY OF STATE
SENATE v SECRETARY OF STATE

Docket Nos. 160907 and 160908. Argued on application for leave to appeal March 11, 2020. Decided December 29, 2020.

In Docket No. 160907, the League of Women Voters of Michigan (LWV), three individual voters, and Michiganders for Fair and Transparent Elections (MFTE) (collectively, the LWV plaintiffs) filed a complaint in the Court of Claims for declaratory and injunctive relief against the Secretary of State regarding 2018 PA 608, which made three sets of changes to the statutory procedures governing petition drives. First, it amended the standards in MCL 168.471 for determining the validity of a petition by requiring that not more than 15% of the signatures to be used could be those of registered electors from any one congressional district, and it also amended MCL 168.477 to prohibit the Board of State Canvassers from counting signatures of registered electors in a congressional district that exceeded the 15% limitation. Second, it amended MCL 168.482(7) to require that petitions include checkboxes to clearly indicate whether the circulator of the petition is a paid signature gatherer or a volunteer signature gatherer. Third, it amended MCL 168.482a to provide that anyone paid to gather signatures must, before circulating the petition, file an affidavit with the Secretary of State indicating that he or she is a paid signature gatherer. A few months after these amendments took effect, the Attorney General issued a written opinion that the amendments violated the state and federal Constitutions. Thereafter, the LWV plaintiffs sued the Secretary of State, seeking a declaratory judgment that the amendments were unconstitutional along the same lines as the Attorney General suggested. A few weeks after the LWV plaintiffs brought their action, in Docket No. 160908, the Michigan Senate and House of Representatives (the Legislature) also brought an action against the Secretary of State, requesting a declaratory judgment that the amendments were constitutional. The two cases were consolidated in the Court of Claims. The Secretary of State, represented by the Attorney General, did not dispute that some of the amendments were unconstitutional, and she also suggested that the Legislature might lack standing to bring its case. The Court of Claims, CYNTHIA D. STEPHENS, J., agreed that the Legislature did not have standing but nonetheless treated its submissions as amicus briefs because the Secretary of State was declining to defend the constitutionality of the amendments. On the merits, the Court of Claims held that the paid-circulator-affidavit requirement was constitutional but that the geographic-distribution and checkbox requirements were not. The LWV plaintiffs filed a bypass application in the Supreme Court, and the Legislature sought to intervene. The Supreme Court denied the bypass and the motion to intervene, and the case went to the Court of Appeals for expedited consideration. In a published decision, the Court of Appeals,

SERVITTO, P.J., and GADOLA, J. (BOONSTRA, J., concurring in part and dissenting in part), affirmed the Court of Claims' rulings that the Legislature lacked standing and that the geographic-distribution and checkbox requirements were unconstitutional, but it reversed on the affidavit requirement, holding that that amendment was unconstitutional as well. 331 Mich App 156 (2020). None of the parties in the LWV case sought to appeal, but the Legislature applied for leave to appeal both its own action and the LWV action. The Supreme Court docketed both cases but informed the Legislature's counsel that it would need to file a motion to intervene in the LWV case to become a party to that action. The motion was subsequently filed, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 505 Mich 988 (2020). It then came to the Supreme Court's attention that MFTE had terminated its petition drive. Consequently, the Supreme Court sought supplemental briefing on, among other things, whether this development mooted the LWV case as to MFTE, whether the remaining LWV plaintiffs had standing, and whether, if the case was moot as to MFTE and no other plaintiff had standing, the Supreme Court should vacate the lower courts' judgments in the LWV case. 506 Mich ___ (2020).

In an opinion by Justice VIVIANO, joined by Chief Justice MCCORMACK and Justices BERNSTEIN and CAVANAGH, the Supreme Court *held*:

The Legislature has standing to appeal when it intervenes in a case in which the Attorney General fails to defend a statute against constitutional attack in court. However, in Docket No. 160907, the case was moot as to the lead plaintiff, MFTE, because it was no longer pursuing its ballot initiative, and no other plaintiff had standing to pursue the appeal. Accordingly, the lower-court decisions in that case were vacated. As a result, any interest the Legislature might have had to provide it with standing had dissipated and thus the matter was moot. Further, extending the standing doctrine to find that the Legislature had suffered harm based on the Attorney General opinion was unwarranted. The Court of Appeals' holding that the Legislature has no standing in its case against the Secretary of State, Docket No. 160908, was thus affirmed on alternative grounds, and both cases were remanded to the Court of Claims for dismissal.

1. In order to intervene in an action, a person must meet the standards of MCR 2.209(B), which requires that the applicant's claim or defense and the main action have a question of law or fact in common; and to intervene in order to appeal, the person must also be an aggrieved party so that a justiciable controversy exists under *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286 (2006). In *Federated*, there was no justiciable controversy because neither of the losing parties below filed a timely appeal and because the Attorney General, who sought to intervene, was not an aggrieved party. *Federated* did not hold that there would be no justiciable controversy if the losing parties below failed to file a timely appeal but a party with appellate standing filed a timely motion to intervene, leaving open the possibility that there may be a justiciable controversy in such circumstances. An entity that otherwise is aggrieved and therefore has appellate standing should not be prohibited from intervening before a lower-court judgment becomes final, i.e., before the deadline to file an application for leave to appeal, and the court rule does not require a motion to intervene to be filed any sooner. Unlike the Attorney General in *Federated*, the Legislature is aggrieved. Under the holding in *Federated*, an aggrieved party is not one who is merely disappointed over a certain result. Rather, to have standing on appeal, a litigant must have suffered a concrete and particularized injury, as would a party plaintiff initially invoking the court's power.

The only difference is that a litigant on appeal must demonstrate an injury arising from either the actions of the trial court or the appellate court judgment rather than an injury arising from the underlying facts of the case. In this case, the Legislature suffered a concrete and particularized injury arising from the actions of the lower courts, which not only concluded that the Legislature had no standing to pursue its case, they also considered and rejected the Legislature's arguments that certain portions of 2018 PA 608 were constitutional in the LWV case. Failing to permit the Legislature's intervention in such circumstances would enable the executive branch to nullify the Legislature's work by declining to contest a lower-court ruling that a challenged statute is unconstitutional, thereby precluding any ultimate judicial determination of the issue, which would pose risks to Michigan's constitutional structure and disrupt the proper functioning of the adversary system. In light of these considerations, the Legislature had a sufficient interest in defending its own work and could fill the breach left by the Attorney General. In sum, when the Attorney General does not defend a statute against a constitutional challenge by private parties in court, the Legislature is aggrieved and, upon intervening, has standing to appeal.

2. When the LWV plaintiffs filed their complaint, they stated that MFTE intended to circulate petitions in 2019 or possibly 2020. However, MFTE subsequently suspended its petition efforts because of the COVID-19 pandemic, which raised the question whether the case had become moot as to MFTE. Although there was no binding precedent on point, the relevant cases from other jurisdictions were in uniform agreement that the voluntary abandonment of a petition drive renders a case moot. Because MFTE is no longer circulating its petition, a judgment on the merits of the case would be a decision in advance about a right before it has been actually asserted and contested or a judgment that could not have any practical legal effect upon a then-existing controversy. A decision would only serve to instruct MFTE as to the law in this area should MFTE choose to pursue a petition in the future. Because MFTE no longer had anything at stake in the dispute, the case was moot as to MFTE.

3. LWV and the individual-voter plaintiffs lacked standing to challenge the constitutionality of 2018 PA 608. The individual-voter plaintiffs and the LWV's members sought to exercise their rights as Michigan registered voters to support placement of proposals on the general election ballot by signing petitions, and they requested a declaratory judgment and injunctive relief. Under *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349 (2010), if a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. MCR 2.605(A)(1) provides that in a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment. An actual controversy exists when a declaratory judgment is needed to guide a party's future conduct in order to preserve that party's legal rights. Though a court is not precluded from reaching issues before actual injuries or losses have occurred, there still must be a present legal controversy, not one that is merely hypothetical or anticipated in the future. As the remaining LWV plaintiffs admitted, and the Secretary of State agreed, they could not show a present legal controversy rather than a hypothetical or anticipated one. A declaratory judgment was not needed to guide the LWV plaintiffs' future conduct. The individual-voter plaintiffs only asked for a declaratory judgment because it might be needed in the future should they decide to sign some initiative; they had no current plans to sign any. Therefore, because the LWV plaintiffs did not meet the requirements of MCR 2.605, they did not have standing. Although cases have held that the bar for standing is lower when a case concerns election

law, those cases did not stand for the proposition that any citizen could bring an action for declaratory judgment regarding the constitutionality of any election law that might affect his or her interests in the future.

4. Generally, when a case is determined to be moot on appeal, the lower-court judgments are vacated. Because this practice is rooted in equity, the decision whether to vacate turns on the conditions and circumstances of the particular case. In this case, the Attorney General declined to defend the constitutionality of 2018 PA 608, the Legislature began its own action in the Court of Claims rather than intervening, the Court of Claims adjudicated a dispute with no "actual controversy" contrary to MCR 2.605(A), and the Court of Appeals issued a published opinion when no appealing party was aggrieved by the lower-court judgment. As a result, portions of 2018 PA 608 were held unconstitutional in a precedential opinion that no original party wished to appeal because they all agreed that the disputed portions of the act were unconstitutional. The fact that the Court of Appeals decision was effectively unreviewable, as well as being the product of a bizarre mix of blunders, counseled in favor of vacating both it and the Court of Claims' decision below and ordering dismissal of the case.

5. Generally, standing is assessed at the outset of the case. Under *Lansing Sch Ed Ass'n*, standing is a limited, prudential doctrine that assesses whether a litigant's interest in the issue is sufficient to ensure sincere and vigorous advocacy. A litigant has standing if there is a legal cause of action and the litigant meets the requirements of MCR 2.605. If a cause of action is not provided at law, a court should determine whether the litigant has standing because of a special injury, special right, or substantial interest that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant. The party's interest must persist as the case goes forward; if it does not, the case becomes moot. In this case, when the Legislature filed its complaint, it had two potential sources of interest in the case. One was the ongoing litigation in the LWV case, which involved the possibility that the Secretary of State would not defend the statutes. However, given that the lower-court decisions in the LWV case were being vacated and the case was being ordered to be dismissed, any interest the Legislature might have had has dissipated. Consequently, to the extent that any such interest could have justified conferring standing on the Legislature when the case was filed, the matter is now moot. The second possible source of standing was the Attorney General opinion that concluded the statute at issue is unconstitutional. A conclusion that the Legislature has standing on this basis would require a very generous view of legislative standing, and the Legislature cited no authority to support this view. To extend the standing doctrine in this manner was unwarranted given that a private party could challenge the Attorney General opinion.

Lower-court judgments in Docket No. 160907 vacated; Court of Appeals judgment in Docket No. 160908 affirmed on alternative grounds; both cases remanded to the Court of Claims for dismissal.

Justice CLEMENT, concurring in part, concurring in the judgment in part, and dissenting in part, fully agreed with the Court's decision to grant the Legislature's motion to intervene in Docket No. 160907 and with the analysis supporting that decision. However, she would have reached the merits of the issues presented, and she therefore dissented from the Court's decision to conclude that the dispute in Docket No. 160907 was moot, both for the reasons offered by Justice ZAHRA as

well as because the allegations made by MFTE and the individual-voter plaintiffs remained live concerns that needed judicial resolution. Not having prevailed on the question of whether the dispute in Docket No. 160907 was moot, she concurred with the result of the Court's disposition of the Legislature's original action for a declaratory judgment in Docket No. 160908. However, she did not join the Court's analysis, because she would have provided a definitive answer regarding why the Legislature could not obtain a judicial declaration to compel an executive official to implement a statutory enactment—namely, that although the Legislature satisfied the test for standing under Const 1963, art 6, § 1 that requires sincere and vigorous advocacy, its claims were nonjusticiable. The purported injury suffered by the Legislature—the practical nullification through executive nonimplementation of a law the Legislature has enacted—is not one that the judiciary has recognized in the past, for the reason that it would threaten the separation of powers and risk injecting the Supreme Court into political disputes between its coequal branches of government rather than allowing the legislative and executive branches to resolve their disputes through the political process. She contended that a party's litigation posture cannot, if unfavorable to some nonparty to the case, give the nonparty standing to file a separate action, noting that this was a problem that the procedural mechanism of intervention was designed to solve, and she disagreed that the Attorney General opinion in this matter was relevant to the analysis. She asserted that neither the Secretary of State's litigation position nor the Attorney General opinion was the sine qua non of the Legislature's declaratory-judgment action, and therefore rejecting them as theories for the Legislature's standing elided the actual question presented: whether the Legislature has recourse to the judiciary to compel the executive to enforce a law.

Justice MARKMAN, joined by Justice ZAHRA, dissenting, would have denied the Legislature's motion to intervene in the LWV case because, given that neither party filed a timely appeal, there was no longer a justiciable controversy in which the Legislature could intervene. He would have held that the Legislature possessed standing in its own right in its case against the Secretary of State under the unique circumstances of this case, which were that the Attorney General, at the request of the Secretary of State, issued an opinion in which she asserted that the challenged statutory provisions are unconstitutional; that in the LWV case, although the Legislature did not file a motion to intervene in either lower court and both lower courts held that the Legislature lacked standing, both lower courts proceeded nonetheless to treat the Legislature as if it were a party; and that, absent the Legislature's participation, there would have been no actual controversy because the Legislature was the only one arguing in favor of the constitutionality of the statutory provisions at issue, given that the Attorney General refused to do so. Justice MARKMAN would have resolved the substantive questions of law in that case, in particular, the constitutionality of the checkbox and precirculation-affidavit requirements as well as the 15% cap on ballot-proposal signatures per congressional district. He noted that the majority not only left unresolved questions it was asked to resolve by the Legislature, but it left those matters in a state of disarray and confusion for citizens concerned about the proper procedures for placing constitutional and legislative measures on the ballot. He also agreed with Justice ZAHRA that the LWV case was not moot for the reasons Justice ZAHRA explained.

Justice ZAHRA, joined by Justice MARKMAN, dissenting, stated that although he would deny the Legislature's untimely motion to intervene in Docket No. 160907 and dismiss that case altogether, he would not have reached the question of whether that case is moot. Instead, for the reasons stated by Justice MARKMAN, he would have recognized the Legislature's standing in

Docket No. 160908 and would have proceeded to decide the merits of that dispute. Justice ZAHRA disagreed with the majority that the issues presented in that case were rendered moot by the postponement of MFTE's ballot-initiative efforts because those issues were of great public significance and were likely to recur, yet evade meaningful judicial review. He explained that given the condensed timeline for collecting signatures on a petition initiating legislation or proposing a voter-initiated constitutional amendment, it would be unreasonable to expect a timely ruling in cases where a specific ballot proposal is at issue, much less a facial challenge to an election law affecting all ballot proposals. He noted that this case was begun more than a year and a half ago and still has not resulted in a final disposition on the challenged provisions, thus presenting an example of the difficulty in obtaining timely relief in ballot-initiative cases. Further, it appeared that MFTE was merely postponing its initiative efforts until the November 2022 election, not abandoning them altogether. Finally, he noted that MFTE's suspension of its petition drive did not change the circumstances under which plaintiffs brought this lawsuit. Various petition drives, apparently relying on the Attorney General's advisory opinion, began collecting signatures on petitions that did not comply with 2018 PA 608 because the Board of State Canvassers instructed those launching petition drives to prepare petition sheets that conformed to the opinion of Attorney General. He stated that the majority opinion's decision added to the uncertainty among those seeking to exercise their rights to engage in direct democracy and that, as a result, petition drives would be caught between either complying with 2018 PA 608, risking rejection early on by the Board of State Canvassers, or complying with the Attorney General's advisory opinion, risking invalidation later by a decision from this Court.

©2020 State of Michigan

# OPINION

Chief Justice:
  Bridget M. McCormack

Chief Justice Pro Tem:
  David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED  December 29, 2020

STATE OF MICHIGAN

SUPREME COURT

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, MICHIGANDERS FOR FAIR
AND TRANSPARENT ELECTIONS,
HENRY MAYERS, VALERIYA
EPSHTEYN, and BARRY RUBIN,

      Plaintiffs-Appellees,

and

SENATE and HOUSE OF
REPRESENTATIVES,

      Intervenors-Appellants,

v                        No. 160907

SECRETARY OF STATE,

      Defendant-Appellee.

SENATE and HOUSE OF REPRESENTATIVES,

        Plaintiffs-Appellants,

v                                          No. 160908

SECRETARY OF STATE,

        Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

VIVIANO, J.

These consolidated cases involve constitutional challenges to recent amendments of the Election Law, MCL 168.1 *et seq.* But we cannot address the merits of the issues in these cases unless they are presented in a justiciable controversy. In these cases, we conclude they are not.

We grant the Legislature's motion to intervene in *League of Women Voters of Mich v Secretary of State*, Docket No. 160907, and hold that the Legislature has standing to appeal when the Attorney General abandons her role in defending a statute against constitutional attack in court. Next, we conclude that the case, now properly before us, is moot as to the lead plaintiff, Michiganders for Fair and Transparent Elections (MFTE), because it is no longer pursuing its ballot initiative. As no other plaintiff has standing to pursue the appeal, we vacate the lower-court decisions. Finally, in light of this analysis, we affirm on alternative grounds the Court of Appeals' holding that the Legislature has no standing in its case against the Secretary of State, Docket No. 160908. Accordingly, we remand both cases to the trial court so they can be dismissed.

# I. FACTS AND PROCEDURAL HISTORY

Under our Constitution, "[a]ll political power is inherent in the people."  Const 1963, art 1, § 1.  Although the people have granted the Legislature lawmaking authority, Const 1963, art 4, § 1, they have retained for themselves three paths to directly exercise that authority: the "referendum," through which the people have "the power to approve or reject laws enacted by the legislature," Const 1963, art 2, § 9; the "initiative," by which the people can "propose laws and . . . enact and reject laws," *id*.; and the proposal of constitutional amendments, Const 1963, art 12, § 2.  Each of these three methods of direct democracy requires the submission of petitions containing a certain number of signatures. *Id*.; Const 1963, art 2, § 9.

The Legislature is not absent from the process.  It is charged with implementing the constitutional provisions for referenda and initiatives, Const 1963, art 2, § 9, and with prescribing the form and manner of signing and circulating petitions proposing constitutional amendments, Const 1963, art 12, § 2.  The Election Law, MCL 168.1 *et seq*., regulates these matters.

In 2018, the Legislature amended the Election Law, making three sets of changes to procedures governing petition drives.  2018 PA 608.  First, it amended the standards for "determin[ing] the validity of a petition" by requiring that "[n]ot more than 15% of the signatures to be used . . . shall be of registered electors from any 1 congressional district." MCL 168.471.  As part of this change, the Legislature also amended MCL 168.477 to prohibit the Board of State Canvassers from counting signatures of registered electors in a congressional district that exceed the 15% limitation.  In other words, only 15% of the countable signatures could come from any one congressional district.  Second, it required

3

that petitions include checkboxes "to clearly indicate whether the circulator of the petition is a paid signature gatherer or a volunteer signature gatherer." MCL 168.482(7). Third, anyone paid to gather signatures must, before circulating the petition, file an affidavit with the Secretary of State indicating that he or she is a paid signature gatherer. MCL 168.482a.

A few months after these amendments took effect, the Attorney General issued a written opinion that they violated the state and federal Constitutions. OAG, 2019-2020, No. 7,310, p ___ (May 22, 2019). Thereafter, plaintiffs—League of Women Voters of Michigan (LWV), MFTE, Henry Mayers, Valeriya Epshteyn, and Barry Rubin (collectively, the LWV plaintiffs)—sued the Secretary of State, seeking a declaratory judgment that the amendments were unconstitutional along the same lines as the Attorney General suggested. As explained in the complaint, LWV is a nonpartisan group focused on voting and democratic rights. The individual plaintiffs are Michigan voters and MFTE is a ballot-question committee that, at the time the complaint was filed, intended to circulate petitions to amend the Constitution.

A few weeks after the LWV plaintiffs brought their action, the Legislature also filed suit against the Secretary of State, requesting a declaratory judgment that the amendments were constitutional. The two cases were consolidated in the Court of Claims. The Secretary of State, represented by the Attorney General, did not dispute that some of the amendments were unconstitutional, and she also suggested that the Legislature might lack standing to bring its case. In its subsequent opinion, the court agreed that the Legislature had no standing but nonetheless treated its submissions defending the statutes as amicus briefs because the Secretary of State was declining to offer any such defense. On the

4

merits, the court held that the paid-circulator-affidavit requirement was constitutional but the geographic-distribution and checkbox requirements were not.

Plaintiffs in the *League of Women Voters* case filed a bypass application in this Court, and the Legislature sought to intervene. We denied the bypass and motion to intervene, and the case went to the Court of Appeals for expedited consideration. In a published decision, the Court affirmed the trial court's holding that the Legislature lacked standing and that the geographic-distribution and checkbox requirements were unconstitutional; it reversed on the affidavit requirement, finding that amendment to be unconstitutional as well. In a partial dissent, Judge BOONSTRA would have held that the Legislature had standing and that the checkbox requirement was constitutional. *League of Women Voters of Mich v Secretary of State*, 331 Mich App 156; ___ NW2d ___ (2020).

None of the parties in the *League of Women Voters* case sought to appeal, but the Legislature filed an application for leave to appeal listing both its own action and the *League of Women Voters* action as the cases being appealed. We docketed both cases, but our Court clerk informed the Legislature's counsel that it would need to file a motion to intervene in the *League of Women Voters* case to become a party to that action. The motion was subsequently filed and the Court heard argument.

It then came to the Court's attention that MFTE had terminated its petition drive. Consequently, we sought supplemental briefing on, among other things, whether this development mooted the *League of Women Voters* case as to MFTE, whether the remaining LWV plaintiffs had standing, and whether, if the case was mooted as to MFTE and no other plaintiff had standing, the Court should vacate the lower courts' judgments in the *League of Women Voters* case.

5

## II. STANDARD OF REVIEW

Questions of law, such as those at issue here, are reviewed de novo.[1]

## III. ANALYSIS

In consolidated cases with this much procedural complexity, our analysis of the various issues is necessarily layered. A roadmap is therefore useful: We begin with the Legislature's motion to intervene in *League of Women Voters of Mich v Secretary of State*, Docket No 160907, which we grant. Next, we hold that this case is moot as to MFTE and that none of the other plaintiffs have standing to maintain the action. Consequently, we dismiss the *League of Women Voters* case and vacate the constitutional holdings below. This leaves the Legislature's appeal in its original action, *Senate v Secretary of State*, Docket No 160908. Because the lower courts' decisions on the merits have been vacated, we conclude the Legislature lacks standing to pursue its own case.

## A. THE MOTION TO INTERVENE

MCR 2.209(B) sets out the requirements for permissive intervention. It states, in relevant part, "On timely application a person may intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common."[2] The Legislature undoubtedly meets this standard—the parties in *League of Women Voters* seek a declaratory judgment as to the constitutionality of certain portions of 2018 PA 608, as does the Legislature.

---

[1] *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 59; 921 NW2d 247 (2018).

[2] MCR 2.209(B)(2). It is unnecessary to consider whether the Legislature may intervene as of right under MCR 2.209(A) because it can intervene under MCR 2.209(B).

In addition to meeting this standard, however, the Legislature must be an aggrieved party. In *Federated Ins Co v Oakland Co Rd Comm*, we stated that the "case ceased to be an 'action' when the losing parties below (plaintiffs) failed to file a timely application for leave to appeal in this Court. Once plaintiffs' deadline for filing a timely application for leave to appeal expired, the case ceased to be a justiciable controversy."[3] However, *Federated* held that

> to pursue such an appeal as an intervenor there must be a justiciable controversy, which in this case requires an appeal by an "aggrieved party." Because neither of the losing parties below filed a timely appeal, and because the Attorney General does not represent an aggrieved party for purposes of this case, there is no longer a justiciable controversy.[4]

In other words, *Federated* held that there was no justiciable controversy because neither of the losing parties below filed a timely appeal and because the Attorney General was not an aggrieved party. *Federated* never held that there would be no justiciable controversy if the losing parties below failed to file a timely appeal but a party with appellate standing filed a timely motion to intervene (i.e., before the deadline to file an application for leave to appeal). Therefore, *Federated* left open the possibility that there may be a justiciable controversy in such circumstances.[5] This rule makes sense—we see no reason why an

---

[3] *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 294; 715 NW2d 846 (2006), dismissing appeal from 263 Mich App 62 (2004).

[4] *Id*. at 288.

[5] *Federated* stated that "there [was] no justiciable controversy because the Attorney General [did] not represent an aggrieved party and because neither of the losing parties below chose to file a timely application for leave to appeal." *Id*. at 297. Although *Federated* went on to say that had the losing parties timely applied for leave to appeal there

7

entity that otherwise is aggrieved and therefore has appellate standing should be prohibited from intervening before a lower-court judgment becomes final, i.e., before the deadline to file an application for leave to appeal.[6] Moreover, the court rule does not require a motion to intervene to be filed any sooner.[7]

---

would have been a justiciable controversy, *id*., this is dicta, as those facts were not presented in *Federated*.

[6] Cf. 7C Wright, Miller & Kane, Federal Practice & Procedure (3d ed), § 1916, pp 571-576 ("[I]n a significant number of cases intervention has been allowed even after judgment. One reason for allowing this is so that the intervenor can prosecute an appeal that the existing party has determined not to take."). We recognize that the Legislature did not file its motion to intervene before the deadline for an application for leave to appeal here. But it did file a timely application for leave to appeal under the expedited timeline established by this Court. See *League of Women Voters v Secretary of State*, 505 Mich 931 (2019). Moreover, the Legislature had filed a motion to intervene earlier when the LWV plaintiffs sought to bypass the Court of Appeals and, after the Court of Appeals issued its decision, we explicitly permitted the Legislature to file another motion to intervene after the expedited deadline for appealing had expired, which we were authorized to do under MCR 7.316(B) ("When, under the practice relating to appeals or stay of proceedings, a nonjurisdictional act is required to be done within a designated time, the Court may at any time, on motion and notice, permit it to be done after the expiration of the period on a showing that there was good cause for the delay or that it was not due to the culpable negligence of the party or attorney.").

[7] By contrast, for example, a motion for a stay pending appeal "may not be filed in the Court of Appeals unless such a motion was decided by the trial court." MCR 7.209(A)(2). Nothing similar appears in MCR 2.209(B), which requires only that the motion to intervene be "timely," such that intervention will not "unduly delay or prejudice the adjudication of the rights of the original parties." In a case like the present one, where the proposed intervenors participated in some capacity below but did not move to intervene, a motion to intervene filed for the first time in this Court poses no threat of delay or prejudice. Indeed, it is functionally equivalent to an appeal from a lower court's denial of a motion to intervene. That is, the case is in nearly the same posture now as it would be if the Legislature had unsuccessfully moved to intervene below and were now appealing that ruling. To be clear, not every such motion, initially filed on appeal, will be deemed timely. Cf. *Amalgamated Transit Union Int'l, AFL-CIO v Donovan*, 248 US App DC 411, 412 (1985) (noting that under the similar federal rule, "[a] court of appeals may allow

Unlike the Attorney General in *Federated*, the Legislature is aggrieved. As *Federated* stated,

> An aggrieved party is not one who is merely disappointed over a certain result. Rather, to have standing on appeal, a litigant must have suffered a concrete and particularized injury, as would a party plaintiff initially invoking the court's power. The only difference is a litigant on appeal must demonstrate an injury arising from either the actions of the trial court or the appellate court judgment rather than an injury arising from the underlying facts of the case.[8]

The Legislature has suffered a concrete and particularized injury arising from the actions of the lower courts. Not only did those courts conclude that the Legislature had no standing to pursue its case, they also considered and rejected the Legislature's arguments that certain portions of 2018 PA 608 were constitutional in the *League of Women Voters* case.

More importantly, failure to permit the Legislature's intervention in such circumstances would enable the executive branch to nullify the Legislature's work by

---

intervention at the appellate stage where none was sought in the district court 'only in an exceptional case for imperative reasons' ") (citation omitted). In this case, however, given the Legislature's participation below and our invitation to it to file a motion to intervene, we deem the motion timely. Cf. *Univ of Notre Dame v Sebelius*, 743 F3d 547, 558 (CA 7, 2014) (granting motion to intervene filed on appeal when the district court failed to rule on the motion below), vacated on other grounds by *Univ of Notre Dame v Burwell*, 575 US 901 (2015).

In deeming the Legislature's motion untimely, the dissents ignore several inconvenient points: the Legislature attempted to intervene when plaintiffs first filed a motion to bypass before the Court of Appeals' decision; the Court, including the dissenters themselves, expressly invited the Legislature to file its motion to intervene after the deadline for applications for leave to appeal had passed; and we have the ability under MCR 7.316(B) to waive deadlines.

[8] *Federated*, 475 Mich at 291-292.

declining to contest a lower-court ruling that a challenged statute is unconstitutional, thereby precluding any ultimate judicial determination of the issue.[9] An executive's nondefense of statutes thus poses grave risks to our constitutional structure.[10] It also greatly disrupts the proper functioning of our adversary system.[11] In these circumstances, as our Court of Appeals recently observed, "[t]he Legislature, as elected representatives of the citizens of Michigan, is essentially taking the place of defendants in this case to ensure an actual controversy with robust contrary arguments."[12] In light of these considerations, we agree the Legislature has a sufficient "interest in defending its own work" and can fill the

---

[9] The United States Supreme Court has articulated these principles in the context of legislative intervention. See *United States v Windsor*, 570 US 744, 762; 133 S Ct 2675; 186 L Ed 2d 808 (2013) ("The Executive's failure to defend the constitutionality of an Act of Congress based on a constitutional theory not yet established in judicial decisions has created a procedural dilemma. . . . [W]ith respect to the legislative power, when Congress has passed a statute and a President has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify Congress' enactment solely on its own initiative and without any determination from the Court."); *Immigration & Naturalization Serv v Chadha*, 462 US 919, 940; 103 S Ct 2764; 77 L Ed 2d 317 (1983) ("We have long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional."); see also *Priorities USA v Nessel*, 978 F3d 976, 980-981 (CA 6, 2020) ("Denying the legislature standing to defend its own law would allow the state executive to nullify a state statute without any ultimate judicial determination.").

[10] See *League of Women Voters of Mich v Secretary of State*, ___ Mich ___, ___; 948 NW2d 70, 74 (2020) (*LWV II*) (VIVIANO, J., concurring).

[11] *Id.*

[12] *Mich Alliance for Retired Americans v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 354993), slip op at 6.

10

breach left by the Attorney General.[13]  Therefore, when the Attorney General does not defend a statute against a constitutional challenge by private parties in court, the Legislature is aggrieved and, upon intervening, has standing to appeal.  The Legislature accordingly has appellate standing in the *League of Women Voters* case.

## B.  MOOTNESS IN *LEAGUE OF WOMEN VOTERS v SECRETARY OF STATE*

As noted, plaintiffs in *League of Women Voters v Secretary of State* are LWV, MFTE, and various Michigan voters.  When plaintiffs filed their complaint, they stated:

> [MFTE] intends to circulate petitions for a constitutional amendment to strengthen and reform Michigan's campaign finance reporting and disclosure requirements.  [MFTE] is drafting its proposal and intended to begin its campaign in the summer of 2019, but because of the uncertainty regarding PA 608 and anticipated additional costs, [MFTE] may need to raise additional financial support and may not be able to circulate petitions for its proposal until 2020.

As plaintiffs' counsel acknowledged to the Court and confirmed in the supplemental briefing, MFTE has suspended its petition efforts because of the COVID-19 pandemic.  This development raises the question whether the case has become moot as to MFTE.

As this Court explained in *Anway v Grand Rapids R Co*:[14]

> "It is universally understood by the bench and bar . . . that a moot case is one which seeks to get a judgment on a pretended controversy, when in reality there is none, or a decision in advance about a right before it has been actually asserted and contested, or a judgment upon some matter which, when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy.  The only way a disputed right can ever be made the subject of judicial investigation is, first, to exercise it, and then, having

---

[13] *LWV II*, ___ Mich at ___; 948 NW2d at 75 n 4 (McCORMACK, C.J., dissenting).

[14] *Anway v Grand Rapids R Co*, 211 Mich 592; 179 NW 350 (1920).

acted, to present a justiciable controversy in such shape that the disputed right can be passed upon in a judicial tribunal, which can pronounce the right and has the power to enforce it."[15]

We have not addressed mootness in the context of a voluntarily abandoned ballot-question petition drive, but the relevant cases we discovered from other jurisdictions are in uniform agreement that the voluntary abandonment of a petition drive renders a case moot. In *Personhood Nevada v Bristol*, the respondents challenged a proposed initiative drive.[16] While the case was on appeal in the Nevada Supreme Court, the deadline for obtaining initiative signatures passed without the backers having submitted any.[17] Like our Court did here, the Nevada Supreme Court ordered the parties to brief whether the case was moot. The initiative proponents argued, among other things, that the court could reach the merits because they planned to file the same petition two years later.[18] The court, citing numerous decisions from other states, had no trouble concluding that "addressing a potential future initiative at this point would be speculative and lead to an improper advisory opinion."[19]

---

[15] *Id*. at 610, quoting *Ex parte Steele*, 162 F 694, 701 (ND Ala, 1908).

[16] *Personhood Nevada v Bristol*, 126 Nev 599; 245 P3d 572 (2010).

[17] *Id*.

[18] *Id*. at 603.

[19] *Id*. See also *id*. at 604 ("[O]ther courts have dismissed appeals under similar circumstances. *See Ulmer v. Alaska Restaurant & Beverage Ass'n*, 33 P.3d 773 (Alaska 2001) (dismissing an appeal because the question regarding a proposed initiative petition's summary became moot when its sponsors failed to file the petition by the deadline and no exception to the mootness doctrine applied, since that court typically resolves such issues in time, the initiative might not be proposed again, and the issue was not so important as to warrant discussion despite lacking a current controversy); *Asher v. Carnahan*, 268 S.W.3d 427 (Mo. Ct. App. 2008) (dismissing an appeal challenging the language of a ballot summary that became moot when the proponents of the initiative petition failed to submit

Another instructive case is *Poulton v Cox*.[20] There, the petitioners backed an initiative to introduce legislation; when the Lieutenant Governor rejected their application, they sought an order requiring the Lieutenant Governor to reverse his action.[21] After filing the petition with the Utah Supreme Court, the petitioners "[p]ublicly and formally ceased 'efforts to place the proposed initiative on the ballot.' "[22] Thus, the issue evaded review "only because" the ballot proponents ended their efforts.[23] The court held that the petition was moot because effective relief no longer was possible.[24]

We agree with the reasoning of *Personhood Nevada*, *Poulton*, and the other cases cited above, and we believe that such reasoning applies with equal force here. The original parties to the case conclude likewise, arguing to the Court in their supplemental briefing that the case is moot as to MFTE. Because MFTE is no longer circulating its petition with the intent to put it on this year's ballot, a judgment on the merits of the case would be "a decision in advance about a right before it has been actually asserted and contested, or a judgment . . . which . . . cannot have any practical legal effect upon a then existing

---

signatures by the deadline, since no guarantee existed that the language at issue would be used again in the future by both the secretary of state and the lower court); *Kerr v. Bradbury*, 340 Or. 241, 131 P.3d 737 (2006) (dismissing as moot a petition for review when the proponents of a ballot measure failed to collect sufficient signatures).").

[20] *Poulton v Cox*, 368 P3d 844; 2016 UT 9 (2016).

[21] *Id*. at 844-845.

[22] *Id*.at 845.

[23] *Id*. at 846.

[24] *Id*.

13

controversy."[25] Our decision would only serve to instruct MFTE as to the law in this area should MFTE choose to pursue a petition in the future.[26] But MFTE does not, at present,

<hr />

[25] *Anway*, 211 Mich at 610.

[26] The Court may hear an otherwise moot case if the issue is "one of public significance that is likely to recur, yet evade judicial review." *Federated Publications, Inc v City of Lansing*, 467 Mich 98, 112; 649 NW2d 383 (2002), abrogated on other grounds by *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463; 719 NW2d 19 (2006) (emphasis added). In arguing that the case is not moot, Justice ZAHRA's dissent relies heavily on a footnote in *Meyer v Grant*, 486 US 414, 417 n 2; 108 S Ct 1886; 100 L Ed 2d 425 (1988). In that case, the Court concluded the matter was capable of repetition yet evading review because it was unlikely that a proponent of a ballot initiative could ever obtain a judgment and gather enough signatures within the required time period, which was six months. *Id*. But the present case does not satisfy either prong of the exception to mootness: it is not likely to recur or to evade review.

With regard to the former prong, the Court in *Meyer* noted that the initiative proponents continued to advocate for the initiative and "plan[ned] future attempts" to have it passed. *Meyer*, 486 US at 418 n 2. Here, as noted above, MFTE has not asserted to this Court that it intends to resume the petition drive later, nor is there any record evidence suggesting it will. And, when asked to brief the question, MFTE agreed the case is moot, thus signaling that it is abandoning its claim for relief in this case. As a result, we cannot conclude the issue is likely to recur.

Nor is there any reason to believe that, even if this issue were likely to recur, it would somehow evade judicial review. This case is moot only because of MFTE's decision to drop the ballot drive. Although the time frame for the ballot drive here is similar to the one in *Meyer*, that case clearly did not involve an issue that could have been fully and finally litigated through all appellate levels in a timely manner. In fact, by the time the case was heard, the election at which the initiative was to appear on the ballot was years past. *Id*. By contrast, we heard and could easily have decided the present case before the relevant election. Indeed, plaintiffs, including MFTE, concede that there is ample time for the issue to receive full appellate review. It has evaded review only because of MFTE's voluntary action. See *Poulton*, 368 P3d at 846 ("The issue did evade review this time, but only because the Petitioners, 'less than one month before oral argument, . . . issued a press release publicly announcing that' " the initiative efforts were ending, and therefore the issue was not likely to evade review). See also *Personhood Nevada*, 126 Nev at 602-604 (determining that the case did not "involve[] a matter of widespread importance that is capable of repetition, yet evading review"). Thus, although election cases sometimes

14

have anything at stake in this dispute.[27] It would be, too, a singular decision: we have failed to discover any case involving ballot initiatives that does not concern an actual ballot initiative.[28] For these reasons, we hold that the case is moot as to MFTE.

---

require dispatch, nothing inherent in the current case or the issues it presents suggests that it could not receive a timely decision on the merits. It is not, therefore, an issue that will evade judicial review were it to arise again in the future.

[27] We recently considered the issue of mootness in the election context in *Paquin v City of St Ignace*, 504 Mich 124; 934 NW2d 650 (2019). There, the Court refused to declare sua sponte that the case was moot. In *Paquin*, the Court reasoned that the case was not moot because though the disputed election had already occurred, the defendant was barred from public office for 20 years after his 2010 felony conviction, and he said he planned to run for office in the future. *Id*. at 131 n 4. If MFTE intends to pursue a ballot initiative in 2022, the facts of this case would seem similar. But the situations are distinguishable. In *Paquin*, the defendant was disabled from running for office. That prohibition, paired with his intent to seek office during the period of the disability, created an existing controversy regarding which the Court's judgment could have a practical legal effect. But in the instant case, even if MFTE intends to pursue its ballot initiative in the future, it would not be disqualified from doing so based on 2018 PA 608. Instead, MFTE's only remaining claim would be that, if it proceeds in 2022, the act will make it more difficult to do so. A live controversy is not presented by the speculative difficulties potentially arising from a party's possible intent to someday do something. Cf. *Lujan v Defenders of Wildlife*, 504 US 555, 564; 112 S Ct 2130; 119 L Ed 2d 351 (1992) ("And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

[28] Justice ZAHRA and Justice CLEMENT fault us for failing to go further than the parties request with regard to mootness. Justice ZAHRA, for example, questions why we do not consider providing plaintiffs relief that they do not ask for: remanding the matter "for further factual development as to whether it is reasonable to expect that the same controversy will recur leading up to the November 2022 election." *Post* at 5 n 13. MFTE clearly had the opportunity in its supplemental briefing on mootness to present any argument concerning its future plans. In light of this, we see no reason to speculate about MFTE's plans or to conscript it to continue this litigation merely so that the Court can reach an issue that it might like to opine on. In our adversary system, it is no small matter that

C.  STANDING AS TO THE OTHER PLAINTIFFS IN *LEAGUE OF WOMEN VOTERS*

Because the issue of whether 2018 PA 608 is constitutional is moot as it pertains to MFTE, the question arises whether the other plaintiffs have standing to challenge the constitutionality of 2018 PA 608.  The remaining plaintiffs are LWV, Mayers, Epshteyn, and Rubin.  LWV's members, according to their complaint, "wish to exercise their rights as Michigan registered voters to support placement of proposals on the general election ballot by signing petitions."  Mayers, Epshteyn, and Rubin also "wish to exercise their rights as Michigan registered voters to support placement of proposals on the general election ballot by signing petitions."[29]

Plaintiffs requested a declaratory judgment and injunctive relief.  As this Court stated in *Lansing Sch Ed Ass'n v Lansing Bd of Ed*,[30] "[W]henever a litigant meets the

---

the plaintiffs are no longer pursuing relief and agree that their victories below should be vacated.  In neither *Meyer* nor any of the other cases cited by Justice ZAHRA did the parties themselves acknowledge their lack of a continuing interest in the litigation and request vacatur and dismissal of the case.  See *post* at 5 n 14.

Like Justice ZAHRA, Justice CLEMENT ignores MFTE's supplemental briefing that implicitly concedes that it no longer has an interest in this case.  Instead of looking to MFTE's recent briefing that reflects the further developments in the case and MFTE's current position on the issue, her analysis only considers allegations in the complaint filed at the outset of this case.  Relying on MFTE's supplemental briefing, we cannot conclude that MFTE needs an answer now to preserve its rights since MFTE has not indicated it has any plans to renew its ballot drive and has not informed us of an intention to begin any other drive.  Any answer we gave would therefore be purely hypothetical.

[29] Epshteyn and Rubin also "live in congressional districts within a densely populated metropolitan area," so they are more likely not to have their signatures counted as a result of the 15% geographic-distribution requirement.

[30] *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349; 792 NW2d 686 (2010).

requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment."[31]   MCR 2.605(A)(1) states: "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted."  An actual controversy exists when a declaratory judgment is needed to guide a party's future conduct in order to preserve that party's legal rights.[32]  Though "a court is not precluded from reaching issues before actual injuries or losses have occurred," there still must be "a present legal controversy, not one that is merely hypothetical or anticipated in the future."[33]

As the remaining plaintiffs now admit, and the Secretary of State agrees, they cannot show a present legal controversy rather than a hypothetical or anticipated one.  A declaratory judgment is not *needed* to guide plaintiffs' future conduct.  Plaintiffs only ask for a declaratory judgment because it perhaps may be needed in the future should they

---

[31] *Id*. at 372.  MCR 2.605 incorporates the doctrine of standing, as well as ripeness and mootness.  *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America v Central Mich Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012) (*UAW*).

[32] *UAW*, 295 Mich App at 495.

[33] *Van Buren Charter Twp v Visteon Corp*, 503 Mich 960, 965 n 16 (2019) (VIVIANO, J., dissenting), citing Borchard, Declaratory Judgments (1934), p 40 ("When the complaint on these tests is considered premature, the dismissal may be explained by any one of a series of labels, e.g., that there is as yet no 'controversy,' that the issue is hypothetical, that the result would be only an advisory opinion, etc."); 26 CJS, Declaratory Judgment, § 28, p 66 ("[A] controversy is justiciable, such that a declaratory judgment action may be maintained, when present legal rights are affected, not when a controversy is merely anticipated.").

17

decide to sign some initiative. They have no plans now to sign any. Therefore, because plaintiffs do not meet the requirements of MCR 2.605, they do not have standing.[34]

It is true that the bar for standing is lower when a case concerns election law. The Court of Appeals noted in *Deleeuw v State Bd of Canvassers* that "[e]lection cases are special . . . because without the process of elections, citizens lack their ordinary recourse. For this reason we have found that ordinary citizens have standing to enforce the law in election cases."[35] *Deleeuw* cited *Helmkamp v Livonia City Council*,[36] which similarly stated, " '[I]n the absence of a statute to the contrary, . . . a private person . . . may enforce by mandamus a public right or duty relating to elections without showing a special interest distinct from the interest of the public.' "[37]

However, these cases should not be interpreted as allowing any citizen to bring an action for declaratory judgment regarding the constitutionality of any election law that might affect his or her interests in the future. In *Deleeuw*, the plaintiffs, petition signers, sought to have Ralph Nader put on the 2004 ballot as an independent candidate for president. In *Helmkamp*, the plaintiffs, residents and electors of Livonia, filed a complaint for a declaratory judgment and an order of mandamus compelling defendants, the City

---

[34] Justice CLEMENT treats the individual plaintiffs the same way she does MFTE: she ignores their supplemental briefing in which they affirm their lack of standing.

[35] *Deleeuw v State Bd of Canvassers*, 263 Mich App 497, 505-506; 688 NW2d 847 (2004), citing *Helmkamp v Livonia City Council*, 160 Mich App 442, 445; 408 NW2d 470 (1987).

[36] *Helmkamp*, 160 Mich App 442.

[37] *Id*. at 445 (citation omitted).

18

Council of Livonia and the Election Commission of Livonia, to call a special election to elect a mayor.

In both of these situations, the facts demonstrated that there was a present legal controversy. In *Deleeuw* there was a candidate whom the plaintiffs claimed should be placed on the upcoming ballot, and in *Helmkamp* there was an election that the plaintiffs claimed should be held. Not so here, where there is no such controversy because MFTE is not currently pursuing a ballot initiative and the other plaintiffs have not alleged that they have any concrete plans to sign any other petition (much less shown that their signatures would not be counted due to 2018 PA 608).[38] There is no specific circumstance that plaintiffs claim should be different—they only want instruction going forward. And nothing in the relevant caselaw gives any voter standing to challenge any election-related laws at any time. At the least, as noted above, we have found no case dealing with ballot-proposal laws *sans* any actual ballot proposal being supported or challenged. In any event, plaintiffs do not meet the requirements of MCR 2.605, and therefore under *Lansing Sch* they have no standing.

### D. VACATUR OF THE LOWER-COURT DECISIONS IN *LEAGUE OF WOMEN VOTERS*

Having determined that the case is moot and that no other plaintiff has standing to pursue the case, we must now consider whether to vacate the lower-court opinions in

---

[38] Whether we should reconsider the election-law standing in light of *Lansing Sch* is another question. *Deleeuw* relies on caselaw that was overruled in *Lansing Sch*, 487 Mich at 378. There is no need to address this issue here.

19

*League of Women Voters v Secretary of State*.  The United States Supreme Court normally

vacates lower-court judgments in moot cases.[39]  We have followed this general practice.[40]

"Because this practice is rooted in equity, the decision whether to vacate turns on 'the

conditions and circumstances of the particular case.' "[41]

---

[39] *Alvarez v Smith*, 558 US 87, 94; 130 S Ct 576; 175 L Ed 2d 447 (2009), citing *United States v Munsingwear, Inc*, 340 US 36; 71 S Ct 104; 95 L Ed 36 (1950).

[40] See *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 489 Mich 884, 884 (2011) (vacating this Court's and the Court of Appeals' opinions because the issue was moot), quoting *Munsingwear*, 340 US at 39-40 ("The established practice of the Court in dealing with a civil case . . . which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below . . . .  When that procedure is followed, the rights of all parties are preserved . . . .").

[41] *Azar v Garza*, 584 US ___; 138 S Ct 1790, 1792; 201 L Ed 2d 118 (2018), quoting *United States v Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft*, 239 US 466, 478; 36 S Ct 212; 60 L Ed 387 (1916).  See also *US Bancorp Mtg Co v Bonner Mall Partnership*, 513 US 18, 25; 115 S Ct 386; 130 L Ed 2d 233 (1994) (referring to the "equitable tradition of vacatur").

This Court has also vacated Court of Appeals opinions as a result of mootness.  See, e.g., *People v Smith*, 502 Mich 624, 632; 918 NW2d 718 (2018) (vacating as moot the part of the Court of Appeals' judgment holding a resignation provision to be invalid because the defendant had resigned from office prior to the Court of Appeals' decision); *In re Investigative Subpoenas*, 488 Mich 1032 (2011) (vacating the Court of Appeals' judgment when a subsequent decision of the United States Supreme Court rendered it moot).  Other courts have also vacated lower-court decisions when cases have been rendered moot.  See, e.g., *Freeman v Burrows*, 141 Tex 318, 319; 171 S2d 863 (1943) ("When a cause becomes moot on appeal, all previous orders and judgments should be set aside and the cause, not merely the appeal, dismissed."); *Van Schaack Holdings, Ltd v Fulenwider*, 798 P2d 424, 431 (Colo, 1990) (affirming "the court of appeals determination that the trial court's judgment should be vacated"); *Dep't of Human Resources, Child Care Admin v Roth*, 398 Md 137, 143; 919 A2d 1217 (2007) (" 'Where there might be some effects from the trial court's decision in a moot case we vacate the judgments below and order that the trial court dismiss the action.' "), quoting *In re Kaela C*, 394 Md 432, 452; 906 A2d 915 (2006);

20

Here, the equitable considerations weigh in favor of vacating the lower-court decisions. This case has been a procedural mess from the beginning—with the Attorney General declining to defend the constitutionality of 2018 PA 608, the Legislature beginning its own action in the Court of Claims rather than intervening, the Court of Claims adjudicating a dispute with no "actual controversy" as required by MCR 2.605(A), and the Court of Appeals issuing a published opinion when no appealing party was aggrieved by the lower-court judgment. Portions of 2018 PA 608 have now been held unconstitutional in a precedential opinion—an opinion that no original party wishes to appeal to this Court because they all agree that the disputed portions of the act are unconstitutional. Leaving aside the merits of the Court of Appeals decision, that it is effectively unreviewable, as well as the product of such a bizarre mix of blunders, counsels in favor of vacating both it and the Court of Claims' decision below and ordering dismissal of the case.

## E. STANDING AND MOOTNESS IN THE LEGISLATURE'S CASE

Generally, standing is assessed at the outset of the case.[42] Under *Lansing Schools*, standing is "a limited, prudential doctrine,"[43] the purpose of which "is to assess whether a litigant's interest in the issue is sufficient to 'ensure sincere and vigorous advocacy.' "[44]

---

*Aquacultural Research Corp v Austin*, 88 Mass App 631, 631; 41 NE3d 418 (2015) ("We conclude that the case is moot and vacate all of the unreviewed decisions.").

[42] See *Girard v Wagenmaker*, 437 Mich 231, 243-244; 470 NW2d 372 (1991); see also *Already, LLC v Nike, Inc*, 568 US 85, 90-91; 133 S Ct 721; 184 L Ed 2d 553 (2013).

[43] *Lansing Sch*, 487 Mich at 372.

[44] *Id*. at 355, quoting *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633; 537 NW2d 436 (1995).

*Lansing Schools* spelled out that "a litigant has standing whenever there is a legal cause of action" and "whenever a litigant meets the requirements of MCR 2.605 . . . ."[45] In addition,

> [w]here a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.[46]

The party's interest must persist as the case goes forward—if it does not, the case becomes moot.[47]

At the time the Legislature filed its complaint here, it had two potential sources of interest in the case.[48] The first was the ongoing litigation in *League of Women Voters v*

---

[45] *Id*. at 372.

[46] *Id*.

[47] See *Already*, 568 US at 91 ("A case becomes moot . . . 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' ") (citation omitted); *Mich Chiropractic Council v Comm'r of Office of Fin & Ins Serv*, 475 Mich 363, 371 n 15; 716 NW2d 561 (2006) (same), overruled on other grounds by *Lansing Sch*, 487 Mich 349. As the United States Supreme Court has explained, "[m]ootness has been described as ' "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." ' " *Arizonans for Official English v Arizona*, 520 US 43, 68 n 22; 117 S Ct 1055; 137 L Ed 2d 170 (1997) (citations omitted). Or, as another court put it, "Mootness . . . 'is akin to saying that, although an actual case or controversy once existed, changed circumstances have intervened to destroy standing.' . . . [S]tanding applies at the sound of the starting gun, and mootness picks up the baton from there." *Sumpter v Wayne Co*, 868 F3d 473, 490 (CA 6, 2017) (citation omitted).

[48] Of course, the Legislature has standing to appeal the lower courts' determinations that it lacks standing in its own case. The Legislature is certainly aggrieved as to those decisions. *Federated Ins Co*, 475 Mich at 291-292 ("An aggrieved party is not one who is merely disappointed over a certain result. Rather, to have standing on appeal, a litigant must have

*Secretary of State*—it was, at the very least, possible at the time of filing that defendant in that case would not defend the statutes. The question thus arises whether an executive officer's actual or threatened nondefense of legislation in a private lawsuit gives the Legislature a sufficient interest to bring its own action against those officers.

This is a complicated issue.[49] Views on legislative standing are wide-ranging, with those such as the late Justice Scalia on the one hand, who vehemently opposed expansion of legislative standing as an encroachment on the separation of powers.[50] On the other

---

suffered a concrete and particularized injury, as would a party plaintiff initially invoking the court's power. The only difference is a litigant on appeal must demonstrate an injury arising from either the actions of the trial court or the appellate court judgment rather than an injury arising from the underlying facts of the case.").

[49] See generally Hall, Abstract, *Making Sense of Legislative Standing*, 90 S Cal L Rev 1, 1 (2016) ("Legislative standing doctrine is neglected and under-theorized. There has always been a wide range of opinions on the Supreme Court about the proper contours of legislative standing doctrine . . . ."). Justice CLEMENT asserts that "the Legislature does not provide a single example of a legislative body maintaining a declaratory-judgment action against an executive officer." *Post* at 9. However, there are cases in which this has occurred. See, e.g., *Romer v Colorado Gen Assembly*, 810 P2d 215, 218-219 (Colo, 1991) (concluding that the governor had standing to sue the legislature and noting the court's past holdings that the legislature "had standing to bring [a declaratory-judgment] action against the governor to challenge a particular construction given certain statutes by the governor" and "to challenge the constitutional validity of gubernatorial vetoes"); see also *Wisconsin Legislature v Palm*, 391 Wis 2d 497, 513 (2020) (holding that the legislature had standing to challenge regulations issued by the Secretary-designee of the Department of Health Services). We take no position on whether these cases were correctly decided.

[50] See *Windsor*, 570 US at 786 (Scalia, J., dissenting) ("[I]f what we say is true some Presidential determinations that statutes are unconstitutional will not be subject to our review. That is as it should be, when both the President and the plaintiff agree that the statute is unconstitutional."); *id.* at 788-789 ("JUSTICE ALITO would create a system in which Congress can hale the Executive before the courts not only to vindicate its own institutional powers to act, but to correct a perceived inadequacy in the execution of its laws. This would lay to rest Tocqueville's praise of our judicial system as one which

23

hand are views such as those of Justice Alito, who would conclude that "in the narrow category of cases in which a court strikes down an Act of Congress and the Executive declines to defend the Act, Congress both has standing to defend the undefended statute and is a proper party to do so."[51] And of course there are views in the middle, such as those

---

'intimately bind[s] the case made for the law with the case made for one man,' one in which legislation is 'no longer exposed to the daily aggression of the parties,' and in which '[t]he political question that [the judge] must resolve is linked to the interest' of private litigants. A. de Tocqueville, Democracy in America 97 (H. Mansfield & D. Winthrop eds. 2000). That would be replaced by a system in which Congress and the Executive can pop immediately into court, in their institutional capacity, whenever the President refuses to implement a statute he believes to be unconstitutional, and whenever he implements a law in a manner that is not to Congress's liking.") (alterations in *Windsor*).

See also Grove, *Justice Scalia's Other Standing Legacy*, 84 U Chi L Rev 2243, 2251 (2017) ("Justice Scalia opposed the expansion of government standing for many of the same reasons that he advocated limits on private-party standing. To Scalia, standing was a way to constrain the federal courts and prevent them from usurping the authority of the political branches."). Judge Bork also advocated strongly for this view in his dissent in *Barnes v Kline*, 245 US App DC 1, 26 (1984), judgment vacated sub nom *Burke v Barnes*, 479 US 361 (1987) (Bork, J., dissenting) ("But the transformation this court has wrought in its own powers necessarily runs much farther than that. If Congress, its Houses, or its members can sue the President for a declaration of abstract legal right, it must follow that the President may, by the same token, sue Congress."); *id.* at 51 ("Gradually inured to a judiciary that spreads its powers to ever more aspects of governance, the people and their representatives may come to accept courts that usurp powers not given by the Constitution, courts that substitute their discretion for that of the people's representatives. Perhaps this outcome is also the more likely . . . because excesses such as this court's governmental standing rationale, shrouded as they are in technical doctrine, are not so visible as to excite alarm. This case represents a drastic rearrangement of constitutional structures, one that results in an enormous and uncontrollable expansion of judicial power. I have tried to make that fact visible. There is not one shred of support for what the majority has done, not in the Constitution, in case law, in logic, or in any proper conception of the relationship of courts to democracy. I have tried to make that fact visible, too.").

[51] *Windsor*, 570 US at 807 (Alito, J., dissenting). The majority in *Windsor* stated:

expressed by the United States Supreme Court in *Coleman v Miller*,[52] in which the Court held that members of the Legislature had standing when their votes had "been overridden and virtually held for naught[,] although if they are right in their contentions their votes would have been sufficient to defeat ratification."[53]

> [I]f the Executive's agreement with a plaintiff that a law is unconstitutional is enough to preclude judicial review, then the Supreme Court's primary role in determining the constitutionality of a law that has inflicted real injury on a plaintiff who has brought a justiciable legal claim would become only secondary to the President's. This would undermine the clear dictate of the separation-of-powers principle that when an Act of Congress is alleged to conflict with the Constitution, it is emphatically the province and duty of the judicial department to say what the law is. Similarly, with respect to the legislative power, when Congress has passed a statute and a President has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify Congress' enactment solely on its own initiative and without any determination from the Court. [*Id*. at 762 (opinion of the Court) (quotation marks, citations, and brackets omitted).]

But this was in the context of allowing the Bipartisan Legal Advisory Group of the House of Representatives to intervene to defend the constitutionality of the Defense of Marriage Act, not allowing them to have standing to initiate their own action every time the Executive declares a law unconstitutional.

[52] *Coleman v Miller*, 307 US 433; 59 S Ct 972; 83 L Ed 1385 (1939).

[53] *Id*. at 438. In other words, the Court held that these allegations established "a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id*. See also *Raines v Byrd*, 521 US 811, 823; 117 S Ct 2312; 138 L Ed 2d 849 (1997) ("It is obvious, then, that our holding in *Coleman* stands (at most, see n. 8, *infra*) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified."); *Ariz State Legislature v Ariz Indep Redistricting Comm*, 576 US 787, 804; 135 S Ct 2652; 192 L Ed 2d 704 (2015) (concluding that the Arizona Legislature had standing when the disputed proposition and the state constitution "would 'nullif[y]' any vote by the Legislature, now or 'in the future,' purporting to adopt a redistricting plan' "), quoting *Raines*, 521 US at

Ultimately, we do not need to resolve this thorny matter in the present case. In light of the above analysis vacating the lower-court decisions in the *League of Women Voters* case and ordering its dismissal, any interest the Legislature may have had in the past has now dissipated. Consequently, to the extent that any such interest could have justified standing when the case was filed, the matter is now moot.[54]

---

823-824 (alteration in *Ariz State Legislature*). There are also other theories of legislative standing and other factors that the United States Supreme Court and other courts have referenced when determining whether the Legislature, or members of the Legislature, have standing. See, e.g., *Judiciary Comm of the US House of Representatives v McGahn*, 445 US App DC 293 (2020), aff'd in part and remanded in part 968 F3d 755 (2020) (Rogers, J., dissenting) (listing the following factors, which are derived from *Raines*, as relevant to whether the Legislature had standing: "(1) the individual plaintiffs alleged an institutional injury that was 'wholly abstract and widely dispersed'; (2) plaintiffs' 'attempt to litigate th[eir] dispute at this time [wa]s contrary to historical experience'; (3) the plaintiffs 'ha[d] not been authorized to represent their respective Houses of Congress . . . , and indeed both Houses actively oppose[d] their suit'; and (4) dismissing the lawsuit 'neither deprive[d] Members of Congress of an adequate remedy . . . , nor foreclose[d] the Act from constitutional challenge.'") (alterations in *Judiciary Comm*).

[54] In reaching the standing issue, Justice MARKMAN's dissent crafts a rule tailor-made for this case and, apparently, this case alone. Standing was appropriate, according to the dissent, given various "unique circumstances" it finds in the present case: the Attorney General's formal opinion declaring the statute unconstitutional, the Legislature's failure to file a motion to intervene in the courts below, the lower courts' holdings that the Legislature lacked standing, the lower courts' treatment of the Legislature "*as if* it were a party [to the [*League of Women Voters* case]," and the fact that "absent the Legislature's participation, there would have been no 'actual controversy . . . .'" *Post* at 12. This medley of facts ignores that standing is determined at the time the complaint is filed. See *Girard*, 437 Mich at 243-244. Except for the formal opinion, none of these "unique circumstances" existed at the time the Legislature brought its suit. And, as we explain below, the formal opinion is not enough to confer standing.

The dissent also points to the injury the Legislature suffers from the "lack of enforcement" of the statute. *Post* at 15. Presumably, this could have occurred before the Legislature filed, but the dissent's meaning is unclear. Does it intend to suggest that any time the executive fails to *enforce* a statute, the Legislature can step in to fill the void?

The second source potentially giving rise to standing is the formal Attorney General opinion that concluded the statute at issue is unconstitutional. That opinion was, as noted, issued before the Legislature filed its lawsuit and it remains in place now. Thus, the only way to hold that the Legislature has standing to pursue its case would be to conclude that any time the Attorney General issues a formal opinion concluding that an act is unconstitutional, the Legislature has been harmed in such a way that it has standing to bring an action for declaratory judgment. Such a conclusion would be an outlier, going far beyond even Justice Alito's view that Congress may step in to defend the constitutionality of an act that has already been struck down by a court when the Executive refuses to do so.[55] It would require a very generous view of legislative standing to allow the Legislature

That would constitute a radical reshaping of the justice system and raise serious separation-of-powers concerns. Under this view, for example, every time a police officer fails to fine a speeding driver on a state road, the Legislature could initiate a prosecution. To the extent the dissent means to say that the Legislature has a sufficient injury whenever the executive fails to *defend* the constitutionality of a statute in court, problems still exist with the dissent's argument. Specifically, when the Legislature filed its case, had the executive branch communicated that it would not defend the statute in court? The dissent does not say. Instead, it falls back upon postfiling events to establish the Legislature's standing at the time of filing, namely the fact that a judicial decision striking down a statute would injure the Legislature by impairing the "effectiveness of its votes . . . ." *Post* at 15. But that threat is present in every case challenging the constitutionality of a statute, whether the executive vigorously defends the law or not. So, under the dissent's theory, can the Legislature file its own case any time a statute is challenged in private litigation? That, too, would represent a significant reworking of the present system.

In short, we believe that by granting the Legislature's motion to intervene, our opinion addresses the concerns raised by the dissent, but in a more measured fashion.

[55] Justice MARKMAN contends that the Legislature not only has standing due to the unique circumstances of this case under *Lansing Sch*, but also would have standing under *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). But *Lujan* set forth the standard for standing generally; it did not take into account the specific

to initiate a declaratory-judgment action whenever the Executive declines to enforce an act it believes unconstitutional, relying on a formal opinion by the Attorney General.[56]  Those formal opinions, it should be noted, do not bind the courts.[57]  Despite arguing that the Attorney General opinion causes harm giving rise to standing, the Legislature has cited no authority supporting this view.[58]  Such an extension of standing is unwarranted where a

considerations regarding legislative standing.  He cites *Chadha*, 462 US 919, and *Windsor*, 570 US 744, to support his conclusion, but both of those cases involved intervention in a suit already initiated by a private party, not standing for the Legislature itself to initiate a suit.  Additionally, legislative standing made more sense in *Chadha*, in which a specific prerogative granted to the Congress via statute—the legislative veto—was threatened.

[56] As noted above, this would pose separation-of-powers concerns.  See note 54 of this opinion.

[57] See *Danse Corp v Madison Hts*, 466 Mich 175, 182 n 6; 644 NW2d 721 (2002).  We have left open the question whether the formal opinions bind even other governmental agencies.  *Id*.  See also *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 8 n 5; 740 NW2d 444 (2007).

[58] In *State ex rel Howard v Okla Corp Comm*, 614 P2d 45; 1980 OK 96 (1980), the Oklahoma Supreme Court held that members of the legislature had standing to sue a governmental agency to force it to comply with a statute that the attorney general had deemed unconstitutional in a formal opinion.  Although the court mentioned the legislature's interest in defending its work, the plaintiffs did not sue in an institutional capacity; rather, they brought the case as " 'citizens and taxpayers of the State of Oklahoma and members of either the Oklahoma Senate or House of Representatives . . . .' " *Id*. at 51.  The court determined that the underlying legal issue was one of public concern to the citizens of the state.  *Id*.  The plaintiffs' status as citizens, in other words, sufficed for standing.  *Id*. at 52 ("[W]here the main object of the suit is to vindicate a public right, a court may rightfully take jurisdiction upon the . . . relation of a private citizen in the name of the State.").  In a subsequent case the same court again determined that individual members of the legislature had standing to challenge an attorney general—but the issue was whether the Legislature needed to follow the attorney general opinion because such opinions had been deemed binding on state officials.  *State ex rel York v Turpen*, 681 P2d 763, 765; 1984 OK 26 (1984).  *Turpen* held that those opinions—i.e., ones that concluded a statute was unconstitutional—were no longer binding and the court therefore declined to

private party could challenge the Attorney General's opinion. Thus, the Legislature had no standing to pursue its case on the basis of the Attorney General opinion.[59]

## IV. CONCLUSION

We can recall few cases that have been so divorced from the factual circumstances giving rise to them as the cases the Court now considers—so much so that the lower-court opinions do not even recount the facts giving rise to the action. But once the underlying circumstances are examined and the MFTE's suspension of its ballot proposal is considered, it becomes patently clear that any decision by this Court on the merits would be purely advisory.[60] In granting the Legislature's motion to intervene, we hold that the Legislature meets the requirements of our court rules for intervention and has appellate

---

reach the merits, *id*. at 767, and in a later case the court held that an attorney general opinion "provides no basis upon which original jurisdiction need be assumed," *Keating v Johnson*, 918 P2d 51, 58; 1996 OK 61 (1996). There is no argument here that the Legislature itself must adhere to the Attorney General's opinion. Thus, even Oklahoma's approach does not appear to support standing in this case.

[59] Justice CLEMENT assails our opinion for not answering the question of whether the Legislature can ever bring an action for declaratory judgment in these circumstances. However, for the reasons discussed in this opinion, we do not believe it is necessary for us to reach this issue. See *PDK Labs Inc v US Drug Enforcement Agency*, 360 US App DC 344, 357 (2004) (Roberts, J., concurring) ("This is a sufficient ground for deciding this case, and the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further.").

[60] The dissents express great concern that this resolution leaves important legal questions concerning the constitutionality of the statute unanswered. We agree that, when it is appropriate, this Court has an obligation to say what the law is. But we cannot let this desire for stability overcome the limits of our role. The judiciary cannot "simply scan the horizon for important legal issues to opine on—we address such issues only as they arise in the genuine controversies between adverse parties that come before us." *LWV II*, ___ Mich at ___; 948 NW2d at 72 (VIVIANO, J., concurring). Because such a case is not before us, we are constrained from reaching the underlying merits.

standing in order to defend a statute that the Attorney General has left undefended in court. But we further hold that the *League of Women Voters* case is moot as to MFTE and that no other party has standing. Therefore we vacate the lower-court decisions in that case. Given these holdings, we affirm on alternate grounds the Court of Appeals' conclusion that the Legislature has no standing to pursue its own case. We therefore remand both cases to the trial court for entry of dismissal orders.

> David F. Viviano
> Bridget M. McCormack
> Richard H. Bernstein
> Megan K. Cavanagh

S T A T E   O F   M I C H I G A N

SUPREME COURT


LEAGUE OF WOMEN VOTERS OF
MICHIGAN, MICHIGANDERS FOR FAIR
AND TRANSPARENT ELECTIONS,
HENRY MAYERS, VALERIYA
EPSHTEYN, and BARRY RUBIN,

      Plaintiffs-Appellees,

and

SENATE and HOUSE OF
REPRESENTATIVES,

      Intervenors-Appellants,

v                                 No. 160907

SECRETARY OF STATE,

      Defendant-Appellee.
_____

SENATE and HOUSE OF
REPRESENTATIVES,

      Plaintiffs-Appellants,

v                                 No. 160908

SECRETARY OF STATE,

      Defendant-Appellee.
_____

CLEMENT, J. (*concurring in part, concurring in the judgment in part, and dissenting in part*).

I concur in full with the Court's decision to grant the Legislature's motion to intervene in Docket No. 160907 and with the Court's analysis of why it is granting that motion. However, having granted intervention, I would reach the merits of the issues presented, and I therefore dissent from the Court's decision to conclude that the dispute in Docket No. 160907 is moot, both for the reasons offered by Justice ZAHRA[1] as well as further reasons I will explain. That said, not having prevailed on the question of whether the dispute in Docket No. 160907 is moot, I further concur with the result of the Court's disposition of the Legislature's other effort at bringing this dispute before the courts: its original action for a declaratory judgment in Docket No. 160908. I cannot join the Court's analysis, however, as I disagree that "we do not need to resolve this thorny matter [of legislative standing] in the present case"—in my view, if we are to close the courthouse door to the Legislature (a decision with which I agree), we owe a definitive answer as to why.

## I. MOOTNESS

I agree with Justice ZAHRA that the issues raised in Docket No. 160907 fall, at minimum, within the exception to the mootness doctrine allowing courts to adjudicate issues which are capable of repetition, yet likely to otherwise evade judicial review. I further believe that there is not even a need to apply an exception to the mootness doctrine, because at least the allegations made by plaintiff Michiganders for Fair and Transparent

---

[1] I am unable to join Justice ZAHRA's dissent in full for the narrow reason that he concludes that the Legislature should be granted relief in its original action against the Secretary of State, and I disagree. Absent that qualification, I agree with his mootness analysis.

2

Elections (MFTE), as well as those made by the individual-voter plaintiffs, remain live concerns that need judicial resolution.[2] Consequently, I dissent from the Court's holding that the complaint in Docket No. 160907 is now moot.

First, as to MFTE, it alleges in its complaint that it "intends to circulate petitions for a constitutional amendment to strengthen and reform Michigan's campaign finance reporting and disclosure requirements." It has not recanted its intent to do that; rather, it abandoned its efforts to collect signatures to place the proposal on the 2020 ballot. But nothing has happened that would change its interest in its proposal—it is not as though some other, similar constitutional amendment was ratified (or even voted on) in 2020, nor has the Legislature enacted legislation that mollifies MFTE's concerns. Taking its complaint at face value, I believe MFTE still retains an interest in knowing whether it must satisfy the requirements of 2018 PA 608.

The majority contends that any decision here "would only serve to instruct MFTE as to the law in this area should MFTE choose to pursue a petition in the future." In a certain literal sense, this is true. Until a ballot-question committee actually gathers the requisite number of signatures, submits them to the Board of State Canvassers, and has those petitions rejected by the board on the ground of being improper in form, there will always be some degree of speculation or uncertainty about what the future holds and whether a judicial interpretation of the statute is strictly necessary. I do not believe this

_____

[2] In response to a request for supplemental briefing from this Court, see *League of Women Voters of Mich v Secretary of State*, 506 Mich ___; 946 NW2d 306 (2020), the parties in Docket No. 160907 contend that their own case is moot. However, given that they have not stipulated to a dismissal of the case, I believe the Court should rely on the allegations made in the verified complaint in the Court of Claims.

3

degree of speculation defeats a declaratory-judgment action under our jurisprudence; it seems very clear to me that a ballot-question committee has a valid interest in knowing what rules it must follow if its efforts are going to be legally valid. We have said that an " 'actual controversy' exists [for purposes of the declaratory-judgment court rule, currently MCR 2.605(A)(1)] where a declaratory judgment or decree is necessary to guide a plaintiff's future conduct in order to preserve his legal rights." *Shavers v Attorney General*, 402 Mich 554, 588; 267 NW2d 72 (1978). That is exactly what we have here. Moreover, MFTE has every right to continue collecting signatures to submit its proposal to voters at a future general election. I believe it has as much of an interest today in knowing what rules it must abide by while gathering signatures as it did when this action was filed.

I also believe the individual-voter plaintiffs in Docket No. 160907 continue to have a live interest in the outcome of this dispute. The majority concludes that their case presents no "actual controversy" under MCR 2.605(A)(1) because they "only want instruction going forward." But that is not at all what they want—indeed, the voters do not allege any need for instructions at all. Rather, they want assurance that any signatures they offer will be legally effective. They seem to me to have at least as much interest in a ruling on that as do the plaintiffs in more routine election cases concerning disputes over whether candidates will appear on the ballot. See, e.g., *Stumbo v Roe*, ___ Mich App ___; ___ NW2d ___ (2020) (Docket No. 353695), lv den ___ Mich ___ (2020) (allowing the township supervisor and treasurer to challenge whether a particular candidate for township clerk was eligible for placement on the ballot). A plaintiff who is informed enough about the candidate field to challenge an allegedly ineligible candidate is not being denied any *personal* ability to vote—such a voter is free to vote for whichever candidate he or she

4

prefers. Rather, in challenging an ineligible name, such a plaintiff is essentially trying to control (or at least influence) the behavior of *all other voters* in the jurisdiction, so that those voters will not be presented with the possibility of voting for a particular option.[3] If voters can litigate the question of whether candidates they have no desire to vote for can appear on a ballot, just to control the options presented to all other voters in the jurisdiction, it seems to me that a voter has an even greater interest in whether their own signature will be legally effective—at that point, the voter is not trying to influence the behavior of others but rather obtain some legal certainty for his or her own participation in the electoral process.

Notably, the majority acknowledges "that the bar for standing is lower when a case concerns election law." Frankly, even in the absence of a relaxed standing rule in election cases, I think a voter positioned as these individual-voter plaintiffs are positioned would have standing to litigate this question. The relaxed standing rule in election cases only strengthens my view—an observation that applies with equal force to MFTE's interests as well. Consequently, while I agree with Justice ZAHRA that this dispute at least falls within the "capable of repetition, yet evading review" exception to our mootness doctrine, I do not even believe the case is moot such that an exception need be invoked.

---

[3] Indeed, the way in which such litigation is directed at influencing the behavior of other voters is particularly apparent when one considers the distinction between being eligible to *run* for office and being eligible to have one's name *printed on the ballot*. See *Barrow v Detroit Election Comm*, 301 Mich App 404; 836 NW2d 498 (2013).

## II. LEGISLATIVE STANDING

## A. THE LEGISLATURE'S CLAIMS ARE NONJUSTICIABLE

Of course, regardless of whether the dispute in Docket No. 160907 is moot, this Court could reach the merits of the legal issues presented if the Legislature can maintain its declaratory-judgment action against the Secretary of State in Docket No. 160908, seeing as the issues presented are essentially identical. The Court of Appeals rejected this argument, holding "that the Legislature did not and does not have standing to bring a declaratory action in the matters at hand." *League of Women Voters of Mich v Secretary of State*, 331 Mich App 156, 175; ___ NW2d ___ (2020). The Legislature appeals this ruling to us, maintaining that it need not intervene in Docket No. 160907 to bring these issues before us and that its own declaratory-judgment action against the Secretary of State under MCR 2.605 in Docket No. 160908 is a sufficient vehicle for it to get a judicial ruling that 2018 PA 608 is constitutional.

Our Constitution vests this Court with "the judicial power of the state," Const 1963, art 6, § 1, which we have described as " 'the right to determine actual controversies arising between adverse litigants,' " *Novi v Robert Adell Children's Funded Trust*, 473 Mich 242, 255 n 12; 701 NW2d 144 (2005), quoting *Anway v Grand Rapids R Co*, 211 Mich 592, 616; 179 NW 350 (1920) (quotation marks omitted). For us to answer the constitutional questions presented, then, we need an "actual controversy" between "adverse litigants." When the Legislature is suing the executive branch over its intended nonenforcement of a statute the Legislature enacted, do we have before us sufficiently adverse litigants who have between them an "actual controversy"?

6

This Court laid out the governing standard for standing in Michigan in *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349; 792 NW2d 686 (2010). There, we said that standing is "a limited, prudential doctrine," *id*. at 372, whose purpose "is to assess whether a litigant's interest in the issue is sufficient to 'ensure sincere and vigorous advocacy,' " *id*. at 355, quoting *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633; 537 NW2d 436 (1995), meaning that "the standing inquiry focuses on whether a litigant 'is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable,' " *Lansing Sch Ed Ass'n*, 487 Mich at 355, quoting *Allstate Ins Co v Hayes*, 442 Mich 56, 68; 499 NW2d 743 (1993).

> Under this approach, a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant. [*Lansing Sch Ed Ass'n*, 487 Mich at 372.]

Here, if the focus is on whether the litigant's interest in the issue is to ensure sincere and vigorous advocacy, I have no doubt that the Legislature can satisfy this threshold. But as *Lansing Sch Ed Ass'n* notes, our standing inquiry is separate from our justiciability inquiry. And I do not believe a legislative declaratory-judgment action against an executive officer is justiciable when the Legislature seeks nothing more than a judicial declaration that the executive must implement a law as the Legislature prefers.

In general, the rule is that "a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment" "[i]n a case of

actual controversy within its jurisdiction . . . ." MCR 2.605(A)(1). Per the text of the rule, then, "[t]he existence of an 'actual controversy' is a condition precedent to invocation of declaratory relief." *Shavers*, 402 Mich at 588. Such an " 'actual controversy' exists where a declaratory judgment or decree is necessary to guide a plaintiff's future conduct in order to preserve his legal rights" and "prevents a court from deciding hypothetical issues," *id.* at 588, 589. This is not the case here. As has been noted in cases involving lawsuits filed by individual lawmakers, once "their legislative work-product [is] enacted . . . their special interest as lawmakers has ceased." *Killeen v Wayne Co Rd Comm*, 137 Mich App 178, 189; 357 NW2d 851 (1984). This is equally true of the Legislature as an institution— without regard to whether its laws are being properly enforced, that does not change the laws' status as public acts.

The Legislature argues that it must be able to maintain its declaratory-judgment action because "[i]f an executive branch member and the Attorney General team up to nullify a law and no party sues, that would leave the Legislature without a remedy." But this is not true—if the Legislature cannot maintain a direct action against the executive branch, "[t]he matter would [be] left, as so many matters ought to be left, to a tug of war between the [Executive] and the [Legislature], which has innumerable means (up to and including impeachment) of compelling the [Executive] to enforce the laws it has written." *United States v Windsor*, 570 US 744, 787; 133 S Ct 2675; 186 L Ed 2d 808 (2013) (Scalia, J., dissenting). See also *id.* at 763 (opinion of the Court) ("The integrity of the political process would be at risk if difficult constitutional issues were simply referred to the Court as a routine exercise."). Our political-question doctrine recognizes that "prudential considerations for maintaining respect between the three branches [may] counsel against

8

judicial intervention[.]" *House Speaker v Governor*, 443 Mich 560, 574; 506 NW2d 190 (1993) (quotations marks, citation, and brackets omitted). "Courts are reluctant to hear disputes that may interfere with the separation of powers between the branches of government." *House Speaker v State Admin Bd*, 441 Mich 547, 555; 495 NW2d 539 (1993). This may help explain why the Legislature does not provide a single example of a legislative body maintaining a declaratory-judgment action against an executive officer.

In short, under *Lansing Sch Ed Ass'n*, our standing analysis and our justiciability analysis are distinct questions. The Court of Appeals held that the Legislature lacks standing. I disagree—if the test of standing is going to be whether we will get sincere and vigorous advocacy, I believe the Legislature satisfies it. However, I agree with the result of denying relief to the Legislature, because its claims are nonjusticiable. The purported injury suffered by the Legislature—the practical nullification through executive nonimplementation of a law the Legislature has enacted—is not one that the judiciary has recognized in the past. We have not done so for good reason: it would threaten the separation of powers and risk injecting this Court into political disputes between the Legislature and executive despite the fact that those coordinate branches of government are capable of resolving their disputes through the political process. When private litigants without access to the constitutional levers of power assert that their rights are being violated—as in Docket No. 160907—I of course believe it is generally the judiciary's duty to resolve such disputes, but if no such litigant steps forward, I would not set this Court up as the arbiter of disputes solely between branches of government to which we are coequal, not superior.

9

## B. RESPONSE TO THE MAJORITY

Although we reach the same result—denying relief to the Legislature in Docket No. 160908—I am unable to join the majority's analysis. The majority says that when the Legislature filed its complaint for a declaratory judgment, it "had two potential sources of interest in the case." The first is "the ongoing litigation in [Docket No. 160907]," which raises the question "whether an executive officer's actual or threatened nondefense of legislation in a private lawsuit gives the Legislature a sufficient interest to bring its own action against those officers." The second "is the formal Attorney General opinion that concluded the statute at issue is unconstitutional." The majority concludes that neither one of these is sufficient to confer standing on the Legislature. As noted, in my view the issue here is not whether the Legislature has *standing* but rather whether its issue is *justiciable*, but setting this distinction aside, I believe these two options erect a straw man that the majority knocks down to elide the actual question presented—whether the Legislature has recourse to the judiciary to compel the executive to enforce a law.

The majority's first proffered and rejected rationale for granting the Legislature standing to maintain its declaratory-judgment action in Docket No. 160908 is the Secretary of State's litigation position in the trial court in Docket No. 160907. The majority frames this as an open and unsettled question—"a complicated issue," where "[v]iews on legislative standing are wide-ranging . . . ." As near as I can tell, however, this is predicated on a proposition for which there is no support: the notion that the *litigation position* of a party in a case can be an injury conferring standing on a nonparty to file suit. Setting aside the particular peculiarity of this case—that it was brought by the Legislature against an executive officer—the majority simply offers no support for the notion that a

10

given party's litigation posture can, if unfavorable to some nonparty to the case, give the nonparty standing to file a separate action.[4]  Indeed, this is the essence of the problem that intervention was designed to solve.  It was developed as a procedural mechanism because "a lawsuit often is not merely a private fight and will have implications on those not named as parties."  7C Wright, Miller & Kane, Federal Practice and Procedure (3d ed), § 1901, p 258.  Intervention thus "strike[s] a balance between . . . those who are presently litigants [who] will prefer that others not be brought in, [and] those on the outside [who] will wish to be made parties [because] they believe that a decision may have an effect on them."  *Id*. at 258-259.  I do not believe a party's litigation position is an injury that can give rise to a declaratory-judgment action and therefore do not understand what analytic relevance there is in rejecting it as a potential option.

Second, the majority posits that the other source of interest the Legislature may have had to maintain its declaratory-judgment action was the Attorney General opinion holding that the statute at issue was, in pertinent part, unconstitutional.  The majority says that "the

---

[4] To the extent that there is any authority on point, it seems to cut in the opposite direction. For example, in *Covenant Med Ctr, Inc v State Farm Mut Auto Ins Co*, 500 Mich 191; 895 NW2d 490 (2017), we held that a healthcare provider lacks an independent cause of action against a no-fault insurer to be compensated for services provided to an injured claimant covered by no-fault insurance.  The provider in *Covenant* presumably wanted to maintain its own cause of action because the claimant had already settled his claim for personal protection insurance (PIP) benefits against the no-fault insurer, and the amount of the settlement was unlikely to be a practical source of recovery for the provider—the provider's bill was nearly 75% of the settlement amount, which also needed to cover the various other aspects of PIP benefits (such as lost wages).  If the provider in *Covenant* could not maintain an action to recover its charges from the claimant's PIP provider, it seems rather unlikely to me that it could have filed a separate action against the PIP provider during the claimant's litigation against the insurer out of concern that the claimant was going to negotiate an inadequate settlement to his PIP claim and render himself uncollectible.

11

only way to hold that the Legislature has standing to pursue its case would be to conclude that any time the Attorney General issues a formal opinion concluding that an act is unconstitutional, the Legislature has been harmed in such a way that it has standing to bring an action for declaratory judgment," and concludes that this "would require a very generous view of legislative standing . . . ." I struggle to see the relevance of the Attorney General opinion. The Legislature's allegation is that the Secretary of State is not going to implement 2018 PA 608 because the statute is alleged to be unconstitutional. As it happens, that conclusion is memorialized here in an Attorney General opinion, but I do not see how or why that is essential to this analysis. If the Attorney General had issued an opinion reaching the opposite conclusions, the Secretary of State could still have insisted on implementing the statute as though it were unconstitutional—she has human agency distinct from the Attorney General and the ability to think and act for herself. The question we face would still be the same: does the Legislature have recourse to the judiciary to compel an executive official to perform a clear legal duty the Legislature has legislated but which the executive official believes is unconstitutional? I believe the answer is "no," but I do not understand the majority's analytic framing.

In Docket No. 160908, a litigant—the Legislature—filed a complaint initiating a civil action asking for a declaratory judgment. We are going to decline to provide that judgment. I agree with that decision, but I believe we owe the litigant a square explanation why. The majority contends that neither the Secretary of State's litigation posture in Docket No. 160907 nor the existence of the Attorney General opinion the Secretary of State is relying on is sufficient to confer standing on the Legislature and closes the courthouse door as a result. I do not believe this is an adequate explanation, because it

12

does not investigate the core concern of the Legislature: whether it may obtain a judicial declaration to compel an executive official to implement a statutory enactment. Neither the Secretary of State's litigation position nor the existence of the Attorney General opinion is the sine qua non of the Legislature's complaint; batting them down gets us no closer to an answer. I simply do not think we can avoid answering the question of whether the Legislature is entitled to maintain its action in Docket No. 160908 and get a judgment on the merits. I agree with the Court that it cannot maintain its action, but I would answer the question squarely rather than beating around the bush.

Elizabeth T. Clement

13

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, MICHIGANDERS FOR FAIR
AND TRANSPARENT ELECTIONS,
HENRY MAYERS, VALERIYA
EPSHTEYN, and BARRY RUBIN,

        Plaintiffs-Appellees,

and

SENATE and HOUSE OF
REPRESENTATIVES,

        Intervenors-Appellants,

v                                 No. 160907

SECRETARY OF STATE,

        Defendant-Appellee.

_____

SENATE and HOUSE OF
REPRESENTATIVES,

        Plaintiffs-Appellants,

v                                 No. 160908

SECRETARY OF STATE,

        Defendant-Appellee.

_____

MARKMAN, J. (*dissenting*).

The majority grants the motion of the Michigan Senate and House of Representatives (the Legislature) to intervene in the suit brought by the League of Women Voters of Michigan (LWV) and others against the Secretary of State, holds that that case is moot as to plaintiff Michiganders for Fair and Transparent Elections (MFTE), and concludes that the remaining plaintiffs in that case lack standing. As a result, the majority vacates the lower-court decisions. It also holds that the Legislature lacks standing in its own case against the Secretary of State. Accordingly, it remands both cases to the trial court to be dismissed.

I respectfully dissent. Instead, I would deny the Legislature's motion to intervene in the LWV case, hold that the Legislature possesses standing in its own right in its case against the Secretary of State, and resolve the substantive questions of law in the latter case, in particular, the constitutionality of the checkbox and pre-circulation affidavit requirements as well as the 15% cap on ballot-proposal signatures per congressional district. The majority opinion leaves all of these questions unanswered. Moreover, the Court not only leaves unresolved questions it was asked to resolve by the Legislature, but it leaves these matters in a state of utter disarray and confusion for every Michigan citizen concerned about the proper procedures for placing constitutional and legislative measures on the ballot. Are those who pursue such measures obligated to abide by the statutory direction of the Legislature or by the direction of the Attorney General in her opinion as construed by the Secretary of State? Take your pick; toss a coin; chance a guess. The majority opinion offers not the slightest legal guidance. Until the issues are resolved at some future date, the initiative and referendum processes of this state will be confused,

2

uncertain, and obscure, likely only to generate further litigation and controversy.[1] I would have answered the questions presented, and I would have done so in a timely manner so that the law might be known in advance of future ballot efforts.

## I. FACTS & HISTORY

In December 2018, the Michigan Legislature passed and the Governor signed 2018 PA 608. This act imposed new requirements for gathering petition signatures for statewide ballot proposals, including initiatives, referendums, and constitutional amendments. In May 2019, the Attorney General issued OAG, 2019-2020, No. 7,310, p ___ (May 22, 2019), in response to a request from Secretary of State Jocelyn Benson regarding the constitutionality of certain aspects of 2018 PA 608. The Attorney General opined that the pre-circulation affidavit requirement, the checkbox requirement, and the 15% cap on ballot-proposal signatures per congressional district, in her judgment, were each unconstitutional.

---

[1] In order to allay this confusion, uncertainty, and obscurity, I would hold respectfully that neither the Board of State Canvassers nor groups submitting petitions should act in reliance on the Attorney General's opinion. While "the extent to which a governmental agency is [ever] bound by an opinion of the Attorney General is open to question," *Danse Corp v Madison Hts*, 466 Mich 175, 182 n 6; 644 NW2d 721 (2002), it is clear that "the opinion of the Attorney General that a statute is unconstitutional does not have the force of law and certainly does not compel agreement by a governmental agency," *East Grand Rapids Sch Dist v Kent Co Tax Allocation Bd*, 415 Mich 381, 394; 330 NW2d 7 (1982). See also *Wikman v City of Novi*, 413 Mich 617, 646-647; 322 NW2d 103 (1982) ("[A]n agency exercising quasi-judicial power does not undertake the determination of constitutional questions or possess the power to hold statutes unconstitutional[.]"). Therefore, the Board of State Canvassers is not bound to follow the Attorney General's opinion. Indeed, given that legislation is presumed to be constitutional, the Board of State Canvassers and groups submitting petitions are instead bound to follow 2018 PA 608.

The LWV, MFTE, Henry Mayers, Valeriya Epshteyn, and Barry Rubin have brought an action for declaratory relief challenging the constitutionality of these aspects of 2018 PA 608 against the Secretary of State, who was, and who continues to be, represented by the Attorney General.[2]  The Court of Claims granted LWV's motion for summary disposition in part and struck down as unconstitutional the provisions that allow no more than 15% of petition signatures to be obtained in any one congressional district and that require petitions to include a box that must be checked if the petition circulator is a paid circulator.  The court upheld the provision that requires paid circulators to file an affidavit with the Secretary of State indicating that the person has been paid to circulate a petition and gather signatures.  LWV filed an appeal of right in the Court of Appeals and a bypass application in this Court.

In a separate case brought in the Court of Claims, the Legislature sought a declaratory judgment that 2018 PA 608 is constitutional in its entirety.  The Court of

---

[2] The LWV describes itself as a "nonpartisan political organization, dedicated to Making Democracy Work through voter education, issue advocacy, and citizen participation." League of Women Voters of Michigan, *Home* <https://www.lwvmi.org/index.html> (accessed December 23, 2020) [https://perma.cc/ZCA7-XF5W].  MFTE is a ballot-question committee that was supporting a 2020 ballot initiative regarding lobby reform. Lawler, MLive, *New Ballot Initiative Aims to Curb Lobbyist Influence Over Michigan Lawmakers* (January 23, 2020) <https://www.mlive.com/news/2020/01/new-ballot-initiative-aims-to-curb-lobbyist-influence-over-michigan-lawmakers.html> (accessed November 5, 2020) [https://perma.cc/A9Z2-335P].  When plaintiffs filed their answer in this Court, they indicated that a proposal was then being drafted.  However, efforts to place the proposal on the 2020 ballot were suspended as a result of the coronavirus pandemic. See Gibbons, MLive, *Ballot Drive to Change Michigan Lobbying Laws Suspended Due to Coronavirus Pandemic* (March 20, 2020) <https://www.mlive.com/public-interest/2020/03/ballot-drive-to-change-michigan-lobbying-laws-suspended-due-to-coronavirus-pandemic.html> (accessed December 23, 2020) [https://perma.cc/27DL-5YP4].  Henry Mayers, Valeriya Epshteyn, and Barry Rubin are individual Michigan voters.  For ease of reference, I will refer to these plaintiffs collectively as "LWV," unless otherwise specified.

4

Claims consolidated these two cases, but ultimately held that the Legislature lacked standing to bring its own case and thus dismissed it. However, the court treated the Legislature's briefs effectively as amicus briefs in the LWV case, given that no party in that case was offering arguments in favor of the constitutionality of 2018 PA 608; the Secretary of State fully agreed with LWV that all of the challenged provisions are unconstitutional. The Legislature appealed the Court of Claims' decision to the Court of Appeals, but did not file a bypass application in this Court, and the Court of Appeals consolidated the two cases for appellate review.

The Legislature then filed a motion in this Court to intervene in the LWV case and requested that we grant LWV's bypass application and uphold the constitutionality of 2018 PA 608 in its entirety. We denied the Legislature's motion to intervene, denied LWV's bypass application, and ordered the Court of Appeals to issue an opinion by January 27, 2020. *League of Women Voters v Secretary of State*, 505 Mich 931 (2019).

The Court of Appeals issued a published opinion by this deadline, holding that the Legislature lacks standing and that the 15% cap on ballot-proposal signatures per congressional district, the checkbox requirement, and the pre-circulation affidavit requirement are each unconstitutional. *League of Women Voters of Mich v Secretary of State*, 331 Mich App 156; ___ NW2d ___ (2020). Judge BOONSTRA, concurring in part and dissenting in part, agreed with the majority that the 15% cap on ballot-proposal signatures per congressional district and the pre-circulation affidavit requirement are unconstitutional, but he would have held that the Legislature possesses standing and that the checkbox requirement is constitutional. The Legislature then filed an application for leave to appeal in this Court and a motion to intervene. We heard oral argument on

5

March 11, 2020, and on July 31, 2020, we directed the parties and the proposed intervenors to file supplemental briefs regarding mootness and standing. *League of Women Voters v Secretary of State*, 506 Mich ___; 946 NW2d 306 (2020). They subsequently did so on August 28, 2020.

## II. STANDARD OF REVIEW

"Whether a party has standing is a question of law that is reviewed de novo." *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). Questions of court rule and statutory interpretation are also reviewed de novo. *Safdar v Aziz*, 501 Mich 213, 217; 912 NW2d 511 (2018).

## III. ANALYSIS

The majority grants the Legislature's motion to intervene in the LWV case, while holding that the Legislature lacks standing to seek declaratory relief in its own right.

## A. THE LWV CASE

In *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 288; 715 NW2d 846 (2006), this Court held that the Attorney General could not appeal as an intervenor in this Court where the losing parties had not themselves sought review. As we stated, "[b]ecause neither of the losing parties below filed a timely appeal, . . . there is no longer a justiciable controversy" and "this Court is not constitutionally authorized to hear non-justiciable controversies." *Id*. at 288, 294-295.

The LWV case is analogous in this regard to *Federated*. The Legislature is not a party in the LWV case and it did not file a motion to intervene in either the Court of Claims or the Court of Appeals. And neither the plaintiffs nor the defendant in LWV filed an

6

application for leave to appeal in this Court. Because neither party below filed a timely appeal, there is no longer a justiciable controversy, and because there is no longer a justiciable controversy, the Legislature cannot intervene. "[T]his case ceased to be an 'action' when the losing parties below . . . failed to file a timely application for leave to appeal in this Court." *Id*. at 294.[3] The Legislature cannot intervene in an action that no longer exists. Rather, the LWV case is over, and the Legislature waited too long to file a motion to intervene. For these reasons, I would deny the Legislature's motion to intervene and would dismiss the application for leave to appeal in the LWV case.

The Legislature argues that it has a right to intervene under MCR 2.209(A)(3), which provides that an applicant has a right to intervene in an action "when the applicant claims an interest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." However, the Legislature is not entitled here to intervention of right under MCR 2.209(A)(3) because there is no "property or transaction" at issue. The only question is whether this Court should exercise its discretion to grant *permissive* intervention under MCR 2.209(B). Accordingly, even assuming that the majority is correct that "*Federated* does not foreclose granting the motion to intervene," that does not mean we are obligated to grant the Legislature's motion to intervene. Nothing

---

[3] As discussed at greater length later, the LWV case is unique in that there were *no* losing parties below given that *both* sides agreed with the Court of Appeals that all three of the challenged provisions are unconstitutional. That does not alter the fact, however, that none of the actual *parties* in the LWV case filed an application for leave to appeal and thus that the case ceased at that point to be a justiciable controversy.

7

precludes us from relying on the fact that neither of the actual parties in the LWV case filed an appeal in this Court as a basis for exercising our discretion in favor of denying the Legislature's motion to intervene in the LWV case. Moreover, I do not see much point in granting the Legislature's motion to intervene in a case that the majority ultimately dismisses on the basis of mootness and lack of standing.

Since I would deny the Legislature's motion to intervene and would dismiss the LWV case, it is unnecessary to decide whether the majority is correct that the LWV case is moot as to MFTE and that the remaining parties lack standing. However, given that both the majority and Justice ZAHRA address mootness, I feel compelled to indicate that I agree with Justice ZAHRA that the LWV case is not moot for the reasons explained by Justice ZAHRA.

## B. "LEGISLATURE" CASE

MCR 2.605(A)(1) provides:

> In a case of *actual controversy* within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted. [Emphasis added.]

In the LWV case, there was *from the start* no "actual controversy" between the parties because both parties (LWV and the Secretary of State) argued that each of the statutory provisions at issue here is unconstitutional. Therefore, absent the Legislature's intervention, the Court of Claims should have peremptorily dismissed the LWV case. Instead of doing this, that court allowed the Legislature to participate, but only as an amicus. Furthermore, the Legislature should have moved at that time to intervene so that it could have been added as an actual party in the LWV case, but it did not.

8

In *Federated*, this Court held that "the party seeking appellate relief [must] be an 'aggrieved party . . . .' " *Id*. at 291. That is, "[i]n order to have appellate standing, the party filing an appeal must be 'aggrieved.' " *Manuel v Gill*, 481 Mich 637, 643; 753 NW2d 48 (2008). As we explained,

> to have standing on appeal, a litigant must have suffered a concrete and particularized injury, as would a party plaintiff initially invoking the court's power. The only difference is a litigant on appeal must demonstrate an injury arising from either the actions of the trial court or the appellate court judgment rather than an injury arising from the underlying facts of the case. [*Federated*, 475 Mich at 291-292.]

"A party who could not benefit from a change in the judgment has no appealable interest." *Id*. at 291 n 2 (quotation marks and citation omitted). "Of course one [also] may not appeal from a judgment, order or decree, in his favor by which he is not injuriously affected." *Id*. (quotation marks and citations omitted). Generally, "a party who prevails on every claim cannot be considered to be aggrieved by a court's ruling." *Manuel*, 481 Mich at 644.

In the LWV case, the Court of Claims held that the 15% geographical limitation and the checkbox requirement are unconstitutional and that the affidavit requirement is constitutional. LWV appealed in the Court of Appeals, arguing that all three requirements are unconstitutional. However, LWV lacked appellate standing with respect to the issues on which it *prevailed* in the Court of Claims because it was not an "aggrieved party." The only issue as to which LWV possessed appellate standing was that pertaining to the affidavit requirement, as to which it did *not* prevail in the Court of Claims. Yet, the Court of Appeals unaccountably ruled on all three of the appellate issues.

Although the Court of Appeals did not address whether LWV *was* an "aggrieved party," it held that the Legislature was *not* an "aggrieved party," because although the Court

9

of Claims held that the Legislature lacked standing, it nonetheless fully considered and addressed the Legislature's arguments. The Court of Appeals also held that the Legislature lacked standing because it did not have an interest that was distinct from that of the general public. Moreover, although the Court of Appeals held that the Legislature lacked standing, the entirety of its opinion reads *as if* the Legislature possessed standing because the Court of Appeals fully addressed its arguments in an indistinguishable manner from the arguments of the LWV. That is, the Court of Appeals' opinion is phrased throughout in terms of LWV representing one side of the dispute and the Legislature representing the other side.

Given that LWV ultimately prevailed on the issues regarding the geographic-distribution-requirement and the checkbox requirement in the Court of Claims and thus was not an "aggrieved party" on those issues-- and given that, according to the Court of Appeals, the Legislature lacked standing-- the Court of Appeals should not have addressed the constitutionality of the geographic-distribution requirement and the checkbox requirement, and yet it did.

The Court of Appeals stated further:

> While the Legislature also argues that "[l]eaving the Court of Claims Opinion in place will result in a single member of the executive branch being able to exercise unchecked veto power over a bill that has already been passed and enacted into law," the Court of Claims analyzed the Attorney General's legal conclusions, this Court scrutinized those conclusions, and presumably, our Supreme Court will also consider the legal conclusions in the Attorney General's opinion. In light of that review process, it cannot be concluded that the Attorney General has "unchecked veto power" over 2018 PA 608. [*League of Women Voters of Mich*, 331 Mich App at 174 n 10.]

10

The Court of Appeals thus erred again, in my judgment, in failing to consider that if this Court were eventually to agree with the Court of Appeals that the Legislature lacked standing, we would then have been unable to consider the legal conclusions of the Attorney General's opinion because *neither* LWV *nor* the Secretary of State was going to appeal the Court of Appeals' decision to this Court since their positions would already have prevailed in the Court of Appeals. In other words, we would have been unable to consider the conclusions of the Attorney General's opinion in the LWV appeal because that case could not have been appealed to this Court, and we would also have been unable to address these conclusions in the *Legislature's* case if we agreed with the Court of Appeals that the Legislature lacked standing to bring its own action. That is, the Court of Appeals seemingly did not recognize the full significance of its holding concerning the Legislature's lack of standing.

Judge BOONSTRA concluded that, because this Court has most recently held that standing is a matter of mere judicial discretion, at least under these unique circumstances, he would exercise that discretion to fully address the Legislature's arguments. The circumstances are indeed unique because the Legislature is suing to maintain the effectiveness of its legislative process in enacting 2018 PA 608-- an act that the Secretary of State is now declining in part to enforce and the Attorney General has opined is unconstitutional in part. In other words, *apart* from the Legislature, there would appear to be *no one* to argue in opposition to the position taken jointly by LWV, the Secretary of State, and the Attorney General.

I generally agree with Judge BOONSTRA. That is, under at least the unique circumstances of this case, I agree that the Legislature possesses standing-- these unique

11

circumstances comprising in particular (a) that the Attorney General, at the request of the Secretary of State, issued an opinion in which she asserted that the challenged statutory provisions are unconstitutional; (b) that in the LWV case, although the Legislature did not file a motion to intervene in either lower court and both lower courts held that the Legislature lacked standing, both lower courts proceeded nonetheless to treat the Legislature *as if* it were a party; and (c) that, absent the Legislature's participation, there would have been no "actual controversy" because the Legislature was the only one arguing in favor of the constitutionality of the statutory provisions at issue.[4]  As Judge BOONSTRA noted, the Legislature stated in its reply brief that

---

[4] The majority contends that I "ignore[] that standing is determined at the time the complaint is filed" and that "[e]xcept for the formal opinion, none of these 'unique circumstances' existed at the time the Legislature brought its suit."  However, given that at the time the Legislature brought its suit, the Attorney General, at the request of the Secretary of State, had issued an opinion in which she opined that the challenged statutory provisions are unconstitutional, the Legislature knew or had reason to believe (and rightfully so, as it turned out) that the Secretary of State, as represented by the Attorney General, would not defend the constitutionality of the statutory provisions at issue in the LWV case.  And indeed, in the Legislature's complaint, it asserted that the Secretary of State's "motivation for obtaining a formal opinion appears to have been so that she can circumvent the requirements of validly enacted statutes she has a legal duty to enforce."  As evidence of this, the Legislature proceeded to observe that "[i]n her letter to Attorney General Nessel, Secretary Benson made clear her personal disdain for 2018 PA 608, characterizing the validly enacted law as establishing 'new grounds for rejecting otherwise valid petition signatures' " and as imposing a " 'burden' " on the process.  The Legislature also referenced the Attorney General's press release regarding 2018 PA 608, in which she stated that the Secretary of State "rightly contests new petition drive law" and praised the Secretary of State for "challenging the legality of the newly established petition drive law."  Department of the Attorney General, *Nessel: Secretary of State Rightly Contests New Petition Drive Law* <https://www.michigan.gov/ag/0,4534,7-359--487945--,00.html> (accessed December 23, 2020) [https://perma.cc/ZU28-ACK8].  Furthermore, at the time the Court of Claims ruled that the Legislature lacked standing, it was well aware that the Secretary of State was not defending the constitutionality of the challenged provisions in

12

this case represents an "incredibly rare" circumstance in which "the Attorney General refuses to defend a statute and instead affirmatively attacks it. Historically, even when the Attorney General disagreed with a policy embodied in the statute, the Office of the Attorney General would set up a conflict wall and appoint assistant attorneys general to argue both sides of the dispute. In that way, there were always attorneys defending the Legislature's enactment." [*League of Women Voters of Mich*, 331 Mich App at 202 n 1 (BOONSTRA, J., concurring in part and dissenting in part) (alterations omitted).]

Judge BOONSTRA further noted that under MCL 14.28, "the attorney general shall . . . when requested by . . . either branch of the legislature . . . intervene in and appear for the people of this state in any . . . court or tribunal, in any cause or matter . . . in which the people of this state may be a party or interested," and he observed that "[h]ad the Attorney General followed that procedure in this case, the standing issue would be moot, and much angst and gnashing of teeth could have been avoided." *League of Women Voters of Mich*, 331 Mich App at 202 n 1 (BOONSTRA, J., concurring in part and dissenting in part).

---

the LWV case because she had already indicated such in her response to plaintiffs' motion for summary disposition.

The majority also questions whether I "intend to suggest that any time the executive fails to *enforce* a statute, the Legislature can step in to fill the void[.]" No, I do not. However, what we have here is not a situation in which the executive has simply chosen not to enforce a statute; rather, it is one in which the executive has affirmatively taken the position that the challenged provisions are *unconstitutional* where the executive was the only party in the LWV case who could possibly have defended the constitutionality of those provisions. It is at least in such a remarkable situation that I believe the Legislature possesses the right to defend laws it has enacted on behalf of the people of this state. Or is it the majority's position that the Attorney General, at her sole and unchecked discretion, may deprive the people of any legal defense of the enactments of its representatives in the Legislature by mere recourse to arguing a contrary position?

Because, unlike the majority, I would not vacate the lower courts' opinions in the LWV case, it is unnecessary for me to decide whether the Legislature would possess standing to bring its own cause of action under such alternative circumstances.

13

As he further recognized, this Court has adopted a "limited, prudential approach" to standing. *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 353; 792 NW2d 686 (2010).[5] Under this approach, "the court's decision to invoke [standing is] one of discretion and not of law." *Id*. at 355 (quotation marks and citation omitted). That is, it is a "prudential limit that [can], within the Court's discretion, be ignored." *Id*. at 356-357. "The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to ensure sincere and vigorous advocacy." *Id*. at 355 (quotation marks and citation omitted). "[W]henever a litigant meets the requirements of MCR 2.605, it is

---

[5] I very much disagree with this Court's decision in *Lansing Sch Ed Ass'n* as I believe that this Court correctly held in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), and *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004)-- both of which were overruled by *Lansing Sch Ed Ass'n*-- that standing is a constitutional doctrine. Const 1963, art 3, § 2 provides, "The powers of government are divided into three branches: legislative, executive and judicial," and "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." In addition, Const 1963, art 6, § 1 provides that the judiciary is to exercise the "judicial power." Reading these provisions together, it is clear that the judiciary is to exercise the "judicial power" and only the "judicial power." "The 'judicial power' has traditionally been defined by a combination of considerations[.]" *Nat'l Wildlife Federation*, 471 Mich at 614. "Perhaps the most critical element of the 'judicial power' has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute, and one in which the plaintiff has suffered a 'particularized' or personal injury." *Id*. at 615 (citation omitted). In other words, exercising the judicial power requires that the plaintiff possesses standing. Just as "standing is an essential . . . part of the case-or-controversy requirement of Article III," *Lujan v Defenders of Wildlife*, 504 US 555, 560; 112 S Ct 2130; 119 L Ed 2d 351 (1992), standing is an essential part of the "judicial power" of Const 1963, art 6, § 1. The doctrine of standing is encompassed within the meaning of the "judicial power," and this Court is limited to exercising the "judicial power." Therefore, we are limited to deciding genuine cases or controversies. However, my position regarding standing did not prevail in *Lansing Sch Ed Ass'n*, and therefore, the Legislature at this time need only satisfy the requirements of the "limited, prudential approach" to standing. Nevertheless, as explained more later, I believe that the Legislature has satisfied the requirements of *both* prudential *and* constitutional standing.

14

sufficient to establish standing to seek a declaratory judgment." *Id*. at 372. As discussed earlier, MCR 2.605(A)(1) requires an "actual controversy." "[T]he essential requirement of the term 'actual controversy' under the rule is that plaintiffs plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised." *Lansing Sch Ed Ass'n*, 487 Mich at 372 n 20 (quotation marks and citations omitted). "[W]here a cause of action [is] not provided at law, the Court, in its discretion, [should] consider whether a litigant [has] standing based on a special injury or right or substantial interest that would be detrimentally affected in a manner different from the citizenry at large . . . ." *Id*. at 359; see also *id*. at 372 (adopting this standard).

In the Legislature's case, there is an "actual controversy" because while the Legislature argues that all the statutory provisions at issue are constitutional, the Secretary of State argues that they are all unconstitutional. That is, the Legislature has an "adverse interest necessitating the sharpening of the issues raised." *Id*. at 372 n 20 (quotation marks and citations omitted). Accordingly, the Legislature meets the requirements of MCR 2.605 and thus possesses standing to seek a declaratory judgment. In addition, the Legislature possesses standing based on a "special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large . . . ." *Id*. at 372. The Legislature possesses a "substantial interest" in the enforcement of the statutory provisions at issue, and it has suffered a "special injury" by their lack of enforcement, each of which is distinct from those of the general public, because the Legislature directly enacted those provisions into law pursuant to its specific authority to exercise the "legislative power" of the state, Const 1963, art 4, § 1, and because the effectiveness of its votes, individually and collectively, would be implicated by a judicial decision to strike

15

down all or parts of the law that was enacted.  For these reasons, I would hold that at least under these unique circumstances, the Legislature possesses standing under *Lansing Sch Ed Ass'n*.[6]

Furthermore, even if *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992), was controlling (which I concede that it is not, see note 5 of this opinion), I believe that the Legislature possesses standing (at least under the instant circumstances) even under the more demanding standing requirement set forth in *Lujan* and adopted by this Court in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), and *National Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004), before those cases were overruled by *Lansing Sch Ed Ass'n*, 487 Mich 349.  Pursuant to *Lujan*:

> "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." '  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'  Third, it must be 'likely,' as opposed to merely

---

[6] In *House Speaker v State Admin Bd*, 441 Mich 547; 495 NW2d 539 (1993), this Court addressed whether four individual legislators possessed standing.  We held that one of the individual legislators possessed standing and that the other three did not.  The instant case is distinguishable because it does not involve individual legislators suing, but instead involves the Senate and the House of Representatives suing as constitutional institutions. See *Raines v Byrd*, 521 US 811, 829; 117 S Ct 2312; 138 L Ed 2d 849 (1997) ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit.").  In addition, this is not a situation in which a legislator is "suing to reverse the outcome of a political battle that he lost," as was the case with one of the legislators in *House Speaker*.  *House Speaker*, 441 Mich at 561.  Rather, this is a situation in which the Legislature is "suing to maintain the effectiveness of [its] vote[s] . . . ."  *Id.*

16

'speculative,' that the injury will be 'redressed by a favorable decision.' "
[*Lee*, 464 Mich at 739, quoting *Lujan*, 504 US at 560-561.]

The Legislature satisfies each of these requirements.  <u>First</u>, the Legislature has suffered an "injury in fact"-- statutes that the Legislature enacted have been rendered null and void. <u>Second</u>, there is a causal connection between the injury and the conduct complained of-- these statutes were rendered null and void as a result of the Secretary of State's refusal to enforce them.  <u>Finally</u>, the injury suffered by the Legislature would be redressed by a favorable decision-- a declaration that the statutes are not unconstitutional.

Concluding that *Lujan* has been satisfied here given that the lower courts effectively allowed the Legislature to intervene is consistent with United States Supreme Court's decisions allowing Congress to intervene in cases to defend the constitutionality of laws. The United States Supreme Court has "long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional." *Immigration & Naturalization Serv v Chadha*, 462 US 919, 940; 103 S Ct 2764; 77 L Ed 2d 317 (1983).  In *Chadha*, Congress was allowed to intervene to defend the constitutionality of a single-house-of-Congress legislative veto.

Similarly, in *United States v Windsor*, 570 US 744; 133 S Ct 2675; 186 L Ed 2d 808 (2013), the Court allowed the Bipartisan Legal Advisory Group of the House of Representatives to intervene in litigation to defend the constitutionality of the Defense of Marriage Act.  As the Court explained:

> [I]f the Executive's agreement with a plaintiff that a law is unconstitutional is enough to preclude judicial review, then the Supreme Court's primary role in determining the constitutionality of a law that has inflicted real injury on a plaintiff who has brought a justiciable legal claim would become only

17

secondary to the President's. This would undermine the clear dictate of the separation-of-powers principle that when an Act of Congress is alleged to conflict with the Constitution, it is emphatically the province and duty of the judicial department to say what the law is. Similarly, with respect to the legislative power, when Congress has passed a statute and a President has signed it, it poses grave challenges to the separation of powers for the Executive at a particular moment to be able to nullify Congress' enactment solely on its own initiative and without any determination from the Court. [*Id*. at 762 (quotation marks and citations omitted).]

The same reasoning applies here.[7] Both the Secretary of State and the Attorney General agree with LWV that the challenged provisions are unconstitutional. The Legislature thus is the only party arguing in favor of the constitutionality of these provisions. Accordingly, under at least these unique circumstances,[8] I would hold that the Legislature possesses standing.[9]

---

[7] I recognize that, as the majority points out, *Windsor* and *Chadha* "involved intervention in a suit already initiated by a private party, not standing for the Legislature itself to initiate a suit." However, what this Court has before it is not simply a case in which the Legislature *itself* sought to initiate a lawsuit. Rather, what this Court has before it are two cases, one initiated by a private party and one initiated by the Legislature. And in regard to the LWV case, although the Legislature did not file a motion to intervene in either lower court and both lower courts held that the Legislature lacked standing, both lower courts nonetheless *treated* the Legislature *as if* it were a party to the LWV case, and absent the Legislature's participation, there would be no "actual controversy" because the Legislature is the only entity arguing in favor of the constitutionality of the statutory provisions at issue. In light of these circumstances, I do not believe that it is at all inappropriate to apply the reasoning of *Windsor* and *Chadha* here.

[8] I am not necessarily asserting that the Legislature only possesses standing under these unique circumstances. Whether the Legislature would possess standing under different circumstances is a question for another day. I am simply asserting that under these unique circumstances, the Legislature *does* possess standing.

[9] I recognize that "[c]ourts are reluctant to hear disputes that may interfere with the separation of powers between the branches of government." *House Speaker*, 441 Mich at 555. However, under the circumstances of this case, in which the Attorney General's refusal to defend the constitutionality of the challenged provisions has transformed what

18

IV.  CONCLUSION

I would deny the Legislature's motion to intervene in the LWV case, hold that the Legislature has standing in its own case against the Secretary of State, and would resolve the substantive questions of law in the latter case.  It is regrettable that the majority leaves these questions unanswered and gives rise to confusion for all participants in this case, as well as for all persons seeking to place constitutional and legislative measures on the ballot, concerning what constitutes the law of this state.  After substantial delays in finally "resolving" this case, we not only do not resolve it in any way but we leave the matter considerably more confused and uncertain.

Stephen J. Markman
Brian K. Zahra

would otherwise constitute an ordinary case or controversy between private parties and the executive branch into a dispute between the Legislature and the executive branch, I would resolve the instant dispute.

# STATE OF MICHIGAN

## SUPREME COURT

LEAGUE OF WOMEN VOTERS OF
MICHIGAN, MICHIGANDERS FOR FAIR
AND TRANSPARENT ELECTIONS,
HENRY MAYERS, VALERIYA
EPSHTEYN, and BARRY RUBIN,

        Plaintiffs-Appellees,

and

SENATE and HOUSE OF
REPRESENTATIVES,

        Intervenors-Appellants,

v                                 No. 160907

SECRETARY OF STATE,

        Defendant-Appellee.

_____

SENATE and HOUSE OF
REPRESENTATIVES,

        Plaintiffs-Appellants,

v                                 No. 160908

SECRETARY OF STATE,

        Defendant-Appellee.

_____

ZAHRA, J. (*dissenting*).

I dissent. The majority opinion improperly grants the motion of the Michigan Senate and House of Representatives (collectively, the Legislature) to intervene in Docket No. 160907. Because I would deny the Legislature's untimely motion to intervene under *Federated Ins Co v Oakland Co Rd Comm*,[1] I would not reach the question of whether that case is moot. Instead, for the reasons stated by Justice MARKMAN, I would recognize the Legislature's standing in Docket No. 160908 under *Lansing Sch Ed Ass'n v Lansing Bd of Ed*[2] and would proceed to decide the merits of this dispute. Nonetheless, I am compelled to address the majority opinion's remarkable conclusion that the case has been rendered moot by the fact that Michiganders for Fair and Transparent Elections (MFTE) has temporarily paused its pursuit of its ballot initiative amidst the current pandemic.

It is a well-established principle that " '[t]he judicial power . . . is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction.' "[3] Accordingly, " 'this Court does not reach moot questions or declare principles or rules of law that have no practical legal effect in the case before' it."[4] Generally speaking, "[a] moot case presents nothing but abstract questions of law which

---

[1] *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286; 715 NW2d 846 (2006).

[2] *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349; 792 NW2d 686 (2010).

[3] *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010), quoting *Anway v Grand Rapids R Co*, 211 Mich 592, 616; 179 NW 350 (1920) (alterations in original; quotation marks omitted).

[4] *Richmond*, 486 Mich at 34, quoting *Federated Publications, Inc v City of Lansing*, 467 Mich 98, 112; 649 NW2d 383 (2002), overruled on other grounds by *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463; 719 NW2d 19 (2006).

2

do not rest upon existing facts or rights" such that "a judgment cannot have any practical legal effect upon a then existing controversy."[5] Of course, moot issues may yet be justiciable where they are "of public significance and are likely to recur, yet may evade judicial review."[6] The facial challenge to the geographic-distribution requirement, checkbox requirement, and affidavit requirement in 2018 PA 608 brought by the League of Women Voters of Michigan, MFTE, Henry Mayers, Valeriya Epshteyn, and Barry Rubin (collectively, plaintiffs) are just such issues.

The constitutionality of an election law affecting *all* exercises of the people's power to propose new laws by petition (the initiative), to approve or reject laws enacted by the Legislature (the referendum), and to propose constitutional amendments by petition (voter-initiated constitutional amendments) is undoubtedly an issue of public significance.[7] The more pertinent question is whether the issues presented are likely to recur, yet evade judicial review. In *Meyer v Grant*, the Supreme Court of the United States held that an action challenging a Colorado law making it a felony to pay petition circulators was not moot, even though the election in which the proponents had hoped to present their ballot proposal had already taken place, because the issue was "one capable of repetition, yet

---

[5] *TM v MZ*, 501 Mich 312, 317; 916 NW2d 473 (2018) (quotation marks and citations omitted).

[6] *In re Midland Publishing Co, Inc*, 420 Mich 148, 152 n 2; 362 NW2d 580 (1984).

[7] See *Ferency v Secretary of State*, 409 Mich 569, 593; 297 NW2d 544 (1980) ("This Court has a tradition of jealously guarding against legislative and administrative encroachment on the people's right to propose laws and constitutional amendments through the petition process.").

evading review."[8]  The Court explained that courts "may exercise jurisdiction over [a challenge to an electoral restriction] if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again."[9] Because "Colorado grants the proponents of an initiative only six months in which to obtain the necessary signatures," the Court reasoned that "[t]he likelihood that a proponent could obtain a favorable ruling within that time, much less act upon such a ruling in time to obtain the needed signatures, is slim at best."[10]  The Court also held that it was reasonable to expect that the same controversy would recur between the proponents and the state because the proponent's initiative had not yet been enacted, the proponents continued to advocate for its adoption, and they continued to make preparations for future attempts to obtain the signatures necessary to place the issue on the ballot.[11]

Similarly, the Michigan Election Law requires signatures on a petition initiating legislation or proposing a voter-initiated constitutional amendment to be made within 180 days of the petition's filing with the Secretary of State.[12]  Despite its decision to postpone its initiative efforts, MFTE retains an interest in knowing whether it must satisfy the requirements of PA 608.  Given the condensed timeline to collect signatures, it is

---

[8] *Meyer v Grant*, 486 US 414, 417 n 2; 108 S Ct 1886; 100 L Ed 2d 425 (1988).

[9] *Id*. (quotation marks, citations, and brackets omitted).

[10] *Id*. at 418 n 2.

[11] *Id*.

[12] MCL 168.472a.

unreasonable to expect a timely ruling in cases where a specific ballot proposal is at issue, much less a facial challenge to an election law affecting *all* ballot proposals. Further, all indications are that MFTE is merely postponing its initiative efforts until the November 2022 election, not abandoning them altogether.[13] Thus, "it is reasonable to expect that the same controversy will recur" between MFTE and the Secretary of State, "yet evade meaningful judicial review."[14]

---

[13] See Gibbons, *Ballot Drive to Change Michigan Lobbying Laws Suspended Due to Coronavirus Pandemic* <https://www.mlive.com/public-interest/2020/03/ballot-drive-to-change-michigan-lobbying-laws-suspended-due-to-coronavirus-pandemic.html> (accessed November 3, 2020) [https://perma.cc/CZ9G-H56J]. According to the article, the Coalition to Close Lansing Loopholes, the group with which MFTE is working in pursuit of its initiative, has indicated that it is postponing the ballot-petition drive until the 2022 election. The majority opinion states that "MFTE has not asserted to this Court that it intends to resume the petition drive later, nor is there any record evidence suggesting it will." *Ante* at 14 n 26. That MFTE has asserted it is not pursuing its ballot initiative "at the present time"—an assertion made in its August 2020 supplemental brief and arguably directed at the November 2020 election, which has since passed—says nothing about its intent to do so at the next election. Although there will always be some degree of uncertainty about what the future holds, it seems clear that a ballot-question committee like MFTE, whose very purpose is to draft ballot proposals in accordance with the Michigan Election Law, has a valid interest in knowing what rules to follow when its initiative efforts inevitably resume. At the very least, a far more appropriate alternative to declaring plaintiffs' case moot, one not considered by the majority opinion, would be to remand this case to the Court of Claims to allow for further factual development as to whether it is reasonable to expect that the same controversy will recur leading up to the November 2022 election. See, e.g., *Reclaim Idaho v Little*, 826 F Appx 592 (CA 9, 2020); *People Not Politicians Oregon v Clarno*, 826 F Appx 581 (CA 9, 2020).

[14] *Meyer*, 486 US at 417 n 2. The majority opinion criticizes my reliance on a footnote in *Meyer*, yet that case is the most relevant to the mootness challenge presented here. Indeed, the Supreme Court of the United States has often stated that cases involving challenges to election laws are not moot where the issues presented were not tied to a particular election, and it has done so in footnotes no less. See, e.g., *Anderson v Celebrezze*, 460 US 780, 784 n 3; 103 S Ct 1564; 75 L Ed 2d 547 (1983) (challenge to Ohio's early filing deadline for independent presidential candidates on First and Fourteenth Amendment grounds not rendered moot by passing of election); *Storer v Brown*, 415 US 724, 737 n 8; 94 S Ct 1274;

Plaintiffs argue that while the issues presented are capable of repetition, they will not evade judicial review because they can be resolved in future election cycles under this

39 L Ed 2d 714 (1974) (challenges to California's statutory requirements for independent candidates for elective public office were not moot because even though "[t]he 1972 election is long over, and no effective relief can be provided to the candidates or voters, . . . the issues properly presented, and their effects on independent candidacies, will persist as the California statutes are applied in future elections"); *Rosario v Rockefeller*, 410 US 752, 756 n 5; 93 S Ct 1245; 36 L Ed 2d 1 (1973) (challenge involving voter's eligibility to participate in New York's party primary system not rendered moot because "[a]lthough the June primary election has been completed and the petitioners will be eligible to vote in the next scheduled New York primary, . . . the question the petitioners raise is 'capable of repetition, yet evading review' "), quoting *Dunn v Blumstein*, 405 US 330, 333 n 2; 92 S Ct 995; 31 L Ed 2d 274 (1972) (challenge to Tennessee's durational residence requirement for voters not rendered moot by the challenger's subsequent eligibility to vote in the next election because "the problem to voters posed by the Tennessee residence requirements is capable of repetition, yet evading review") (quotation marks and citations omitted).

Further, while the majority opinion distinguishes *Meyer*, in a footnote, on the basis that it "did not involve an issue that could have been fully and finally litigated through all appellate levels in a timely manner," *ante* at 14 n 26, I fail to see how the issue in *Meyer* is any different from the issues presented in this case. *Meyer* involved a challenge to a statutory prohibition against the use of paid circulators on First and Fourteenth Amendment grounds. Here, plaintiffs challenge the geographic-distribution requirement, checkbox requirement, and affidavit requirement in PA 608 on numerous state and federal constitutional grounds. That is, both *Meyer* and this case involve constitutional challenges to election laws with condensed time frames.

Moreover, unlike the majority opinion, I do not find the caselaw from other states persuasive or helpful. None of those cases appears to distinguish the Supreme Court's decision in *Meyer*. *Personhood Nevada v Bristol*, 126 Nev 599, 603-604; 245 P3d 572 (2010), and the other cases the Nevada Supreme Court relied on in declaring that case moot, concerned facts specific to the particular initiative at issue and thus lacked the "public, widespread importance to necessitate th[e] court's review . . . ." Here, plaintiffs' facial challenge to PA 608, which affects all ballot proposals, clearly involves issues of great public importance. In *Poulton v Cox*, 368 P3d 844, 845; 2016 UT 9 (2016), the petitioners terminated their efforts to place the initiative on the ballot before the Utah Supreme Court heard oral argument and did not plan to place that initiative on a future ballot. The same cannot be said of MFTE. See note 13 of this opinion.

6

Court's expedited litigation procedure. This case, however, presents a prime example of the difficulty in obtaining timely relief in ballot-initiative cases. Plaintiffs filed their action against the Secretary of State on May 23, 2019. It took nearly six months just for the case to reach this Court, and that was only because plaintiffs filed an application to bypass a decision from the Court of Appeals. We are now over a year and a half removed from the inception of this litigation and there has yet to be a final disposition on the challenged provisions. The majority opinion's decision today further delays resolution of these jurisprudentially significant issues to an unknown date.

Finally, MFTE's suspension of its petition drive has not changed the circumstances under which plaintiffs brought this lawsuit. As plaintiffs themselves acknowledge, the uncertainty surrounding petition drives has existed from the moment the Attorney General opined that various portions of PA 608 were unconstitutional.[15] Various petition drives, apparently relying on the Attorney General's advisory opinion, began collecting signatures on petitions that did not comply with PA 608 because the Board of State Canvassers instructed those launching petition drives to prepare petition sheets that conformed to the opinion of Attorney General.[16] Aside from the fact that PA 608 is presumed constitutional

_____

[15] Plaintiffs' Verified Complaint, ¶ 57 ("While the Attorney General has recognized the unconstitutionality of PA 608, until Michigan courts declare it unenforceable there will be considerable uncertainty about how and when to undertake the considerable work and expense required to circulate petitions to qualify for the ballot. Given this uncertainty, those wishing to exercise their right to petition may be compelled to wait until their rights are judicially clarified before proceeding.").

[16] On June 11, 2019, the Secretary of State and the Board of State Canvassers issued instructions for ballot proposals, stating that the Board intended to comply with OAG, 2019-2020, No. 7,310, p ___ (May 22, 2019), because it believed it was bound by the Attorney General's opinion, but they cautioned that the public should be wary of the

until the judiciary exercises its exclusive power to say otherwise,[17] the majority opinion's decision today adds to the uncertainty among those seeking to exercise their rights to engage in direct democracy. Petition drives will continue to find themselves caught between Scylla and Charybdis: either comply with PA 608 and risk rejection early on by the Board of State Canvassers, or comply with the Attorney General's advisory opinion and risk invalidation later by a decision from this Court.

Accordingly, while I would deny the Legislature's motion to intervene in Docket No. 160907 and dismiss that case altogether, I disagree with the majority opinion that the issues presented in that appeal—the same issues presented in Docket No. 160908—are rendered moot by the postponement of MFTE's ballot-initiative efforts. Instead, the facial

opinion's conclusions as to the constitutionality of PA 608. See Department of State, *Sponsoring a Statewide Initiative, Referendum or Constitutional Amendment Petition*, <https://www.michigan.gov/documents/sos/Initiative_and_Referendum_Petition_Instructions_2019-20_061119_658168_7.pdf>, pp 4-5 (accessed November 3, 2020) [https://perma.cc/5QX3-WSAH]. In a letter dated September 23, 2020, the Secretary of State reaffirmed the Board's position, incorporating the June 11, 2019 letter by reference. See Department of State, *Submitting Petition Signatures to Facilitate Efficient Review*, <https://www.michigan.gov/documents/sos/Submitting_Petition_Signatures_Guidance_703168_7.pdf> (accessed November 3, 2020) [https://perma.cc/M8BT-RDNH]. Yet the Secretary of State and the Board fail to recognize that the extent to which an Attorney General's opinion even binds a government agency is open to question. See *Danse Corp v Madison Hts*, 466 Mich 175, 182 n 6; 644 NW2d 721 (2002); see also *East Grand Rapids Sch Dist v Kent Co Tax Allocation Bd*, 415 Mich 381, 394; 330 NW2d 7 (1982) ("[T]he opinion of the Attorney General that a statute is unconstitutional does not have the force of law and certainly does not compel agreement by a governmental agency[.]").

[17] See *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007) ("A statute challenged on a constitutional basis is clothed in a presumption of constitutionality[.]") (quotation marks and citation omitted); *North Ottawa Community Hosp v Kieft*, 457 Mich 394, 403 n 9; 578 NW2d 267 (1998) ("[I]t is unquestioned that the judiciary has the power to determine whether a statute violates the constitution.").

challenges lodged against PA 608 are issues are of great public significance and are likely to recur, yet evade meaningful judicial review. Because I am not convinced that plaintiffs, the purported moving parties now seeking to have their own case declared moot, have satisfied the heavy burden required to demonstrate mootness, I would not grant the rare relief the majority opinion grants today.[18] Instead, I would decide these important questions forthwith.

Brian K. Zahra<br>
Stephen J. Markman

---

[18] See *MGM Grand Detroit, LLC v Community Coalition for Empowerment Inc*, 465 Mich 303, 306-307; 633 NW2d 357 (2001) ("[T]he burden of demonstrating mootness is a heavy one. . . . [T]he party urging mootness on the court must make a very convincing showing that the opportunity for an appellate court to review the matter should be denied. Not surprisingly, it is rare for a court to grant such a motion.") (quotation marks and citation omitted).